**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

ROBERT HENRY MOORMANN,
            *Petitioner-Appellant,*

            v.

DORA B. SCHRIRO,* Director,
Arizona Department of
Corrections,
            *Respondent-Appellee.*

No. 00-99015

D.C. No.
CV-91-01121-PHX-
ROS

OPINION

Appeal from the United States District Court
for the District of Arizona
Roslyn O. Silver, District Judge, Presiding

Argued and Submitted
November 8, 2001—Pasadena, California
Submission Deferred February 15, 2002
Submission Deferred September 26, 2002
Resubmitted October 3, 2005

Filed October 13, 2005

Before: Mary M. Schroeder, Chief Judge, Stephen S. Trott,
and Johnnie B. Rawlinson, Circuit Judges.

Opinion by Chief Judge Schroeder

---

*Dora B. Schriro, is substituted for her predecessor, Terry Stewart, as Director of the Arizona Department of Corrections. Fed. R. App. P. 43(c)(2).

14007

**COUNSEL**

Denise I. Young, Tucson, Arizona, for the petitioner-appellant.

John Presley Todd, Phoenix, Arizona, for the respondent-appellee.

**OPINION**

SCHROEDER, Chief Judge:

Robert Henry Moormann was convicted in Arizona of the first degree murder of his elderly adoptive mother and sentenced to death in 1985. This is an appeal from the district court's denial of his first federal petition for habeas corpus relief. He earlier filed two unsuccessful state petitions for collateral relief after losing his direct appeal from the conviction and sentence in state court.

We heard oral argument in this case in November 2001. We then deferred submission pending the Supreme Court's decision in *State v. Ring*. 536 U.S. 584 (2002). In *Ring*, the Court decided that the Arizona sentencing scheme applied in this case, in which the trial judge alone determined the presence or absence of aggravating factors required by Arizona law for the imposition of the death penalty, was not compatible with the Sixth Amendment. 536 U.S. at 589. We again deferred submission pending the outcome of other cases with priority that determined the retroactivity of *Ring*. *See Pizzuto v. Arave*, 280 F.3d 949 (9th Cir. 2002); *amended by* 385 F.3d 1247 (9th Cir. 2004); *aff'd* 385 F.3d 1247 (9th Cir. 2004); *Summerlin v. Stewart*, 341 F.3d 1082 (9th Cir. 2003) (en banc); *rev'd sub nom. Schriro v. Summerlin*, 542 S.Ct. 2519 (2004). Subsequently, the Supreme Court held that *Ring* is not retroactive to cases on habeas corpus review. *Schriro v. Summerlin*, 124 S.Ct. at 2526. Thus, *Ring* ultimately does not affect the current appeal. Given the length of time that had passed since oral argument, we then gave the parties an opportunity to file supplemental briefs. We have received and considered those briefs and this case can now be decided.

In order to set the legal framework for our decision, we first determine that the provisions of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") do not apply to this case. *See* 28 U.S.C. § 2244 et seq. Chapter 153 of

AEDPA, dealing with general habeas corpus petitions, does not apply to cases which were pending at the time AEDPA became effective. *See Lindh v. Murphy*, 521 U.S. 320, 336 (1997) ("[T]he new provisions of chapter 153 generally apply only to cases filed after the [Antiterrorism and Effective Death Penalty] Act became effective."). Moormann filed his initial habeas petition in July 1991, and an amended petition in September 1993, both well before AEDPA's effective date of April 24, 1996. *Id.* at 322. The provisions of chapter 154, dealing with special habeas corpus proceedings in capital cases, do not apply unless a state "opts in" by establishing a statute or court rule for the appointment and compensation of competent counsel in state post-conviction proceedings brought by indigent capital prisoners. *See* 28 U.S.C. § 2261(b). It is undisputed that Arizona has not "opted in." Thus, neither the general nor the capital case provisions of AEDPA apply to this case.

The parties, as is to be expected under the our pre-AEDPA capital habeas jurisprudence, devote a great deal of time to discussing whether Moormann's various claims can be considered in federal court, or whether they have been forfeited by his failure to bring them in state court, or by his having presented them in a manner that invokes state procedural bars to their consideration by the state supreme court. *See Duncan v. Henry*, 513 U.S. 364, 365 (1995). Although we affirm the district court's dismissal of most of the claims, we observe that some of Moormann's federal claims were never properly litigated in state court, but were handled by counsel with a conflict of interest. Moormann thus presents some claims of ineffective assistance of appellate counsel that appear colorable on this limited record. We therefore vacate the district court's judgment and remand for further proceedings on those claims.

## I.   FACTS

The facts are set out in all their lurid detail in the Arizona Supreme Court's opinion on direct appeal. *State v. Moor-*

*mann*, 744 P.2d 679 (1987). Moormann appeals his conviction for the murder of his adoptive mother during a furlough from state prison. Moormann was apprehended after his strange and inconsistent behavior came to the attention of the local police.

In January 1984, Robert Moormann was incarcerated in the Arizona State Prison in Florence, Arizona, serving a sentence of nine years to life for kidnapping. Moormann's adoptive mother, Roberta, then age 74, traveled by bus on Thursday, January 12, to visit with Moormann during a 72-hour furlough. They checked into the Blue Mist Motel in Florence.

At about seven a.m. the next morning, Friday, January 13, 1984, Moormann called Marianne Southworth, the friend who had brought Roberta to the prison from the bus depot, and told her that when she came to the motel that afternoon, he would like her to take him to Mesa so that he could see a lawyer. Sometime between six and seven-thirty a.m., Moormann walked to a store where he purchased a buck knife, a steak knife, and some food. Shortly after eight a.m., Moormann went to a local pizza parlor owned by a former prison guard, where he bought a soda. He told the owner that he was on furlough with his mother, that she was not feeling well, but that they would come back that evening for dinner.

At about nine a.m., Moormann went to the front desk of the Blue Mist and asked the owner to hold both maid service and phone calls because his mother was ill. At around this time, he also approached the owner's wife, asked her not to come to the room because his mother was sick, and asked to borrow some disinfectant spray. She testified that Moormann smelled horrible, that he had some blood on his face, and that some towels he later left outside his room smelled so bad that she threw them away.

When Roberta's friend, Marianne Southworth, arrived that afternoon with Roberta's suitcase, Moormann told her that his

mother had been gone since he returned from getting her a salad at ten that morning. Moormann also said that his mother had asked him to dispose of some garbage bags. Marianne refused to help dispose of the bags. She noticed that Roberta's purse was still in the motel room and that the room was extremely cold because the air conditioning was turned up all the way. At around four p.m., Moormann called Marianne at her home and asked whether his mother had called.

At about four-thirty p.m., Moormann approached the motel owner and asked him whether the garbage would be collected the next morning. When the owner told Moormann that the garbage would not be collected until Monday morning, Moormann explained that his mother had bought some meat that spoiled and he needed to throw it out. During the evening, Moormann asked a liquor store clerk and the pizza parlor owner whether he could dispose of spoiled meat or animal guts in their dumpsters. Both refused.

Acting on a tip from the suspicious pizza parlor owner, two Florence police officers went to the Blue Mist at around ten-thirty, where they knocked on Moormann's door and explained that they had heard his mother was ill and they wanted to check on her welfare. Moormann told them that his mother had been sick that morning but, after feeling better, had gone visiting with a Mexican woman at about six p.m. He said that he had not heard from her since, and that he was very worried. Moormann was wearing only a pair of unzipped trousers and a belt.

The officers looked in the motel's dumpsters, but did not see anything suspicious. They left the motel and went to the prison, where they got a partial description of Roberta. They then returned to the motel, where they parked in front of Moormann's room. About five minutes later, Moormann came out of his room and approached the police car. The officers asked if his mother had returned, and when he said no they asked him for a physical description of his mother.

Moormann expressed concern that his mother had not returned because she had not taken her medication with her. When two other officers arrived at the motel a few minutes later, he insisted on taking them into the room to show them his mother's medication. Moormann told the officers that his mother had sent him to the U-Totem to buy a knife for her to give to a friend, and that when he returned his mother was gone. This version of events contradicted his earlier story. Moormann also told one of the officers that a friend had given him some cow guts, that he had been trying to get rid of them, and that he had eventually flushed them down the toilet.

Sometime between ten-thirty and eleven p.m., Moormann asked a corrections officer, whom he encountered in the motel parking lot, where he could dispose of twenty-five pounds of spoiled hamburger meat that his parents had brought with them. The officer suggested that he call the officer in charge of his unit at the prison. At twelve-twenty a.m. on Saturday the 14th, Moormann called the lieutenant in charge of his prison unit and asked for help. He said that his cousin had dropped off some dog bones a couple of days earlier and that he needed to get rid of them and some other stuff, that his mother was out visiting, and that the dumpster at the motel was full. The lieutenant agreed to help and came by about ten minutes later. Moormann put a box in the bed of the lieutenant's truck. He then asked for a ride back to the prison so that he could get something out of his living quarters. The lieutenant refused, returned to the prison and put the box, in which he could see some clean bones, out by the dumpster. At around one-thirty a.m., when he received a call from the police saying that Moormann had been acting suspiciously, asking to throw out spoiled meat, and that Moormann's mother was apparently missing, the lieutenant told the police about the box he had picked up. He and a policeman opened the bags in the box and found what looked like human bones and tissue. The policeman took the box to a hospital for analysis.

After their second conversation with Moormann, the officers went back to their car to wait. Moormann came out of his room about fifteen minutes later, around one-thirty a.m., and crossed the parking lot to the public telephone. The officers called this activity in to the police captain, who told the officers not to let Moormann go back into his room. The officers drove their car back to the front of Moormann's room and asked him if he would like to wait in the car for his mother to come back. When he said yes, one of the police officers offered him the front passenger seat and went to sit in the back seat. For about an hour and fifteen minutes, Moormann sat in the car, dozing off and occasionally conversing with the officers. At two-forty-five a.m., two officers from the prison arrived at the Blue Mist and informed the officers that the bones in the box were human.

The officers asked Moormann to get out of the car, handcuffed him, and told him that he was under arrest on suspicion of murder. As Moormann was getting back into the car, he said "I wonder if I need a lawyer. I'll leave it up to you guys whether I need a lawyer." The officers did not reply. Moormann then stated that he wanted to confess. The officers told him to wait, that they were on their way to the police station. About five minutes later, Moormann said "You can change the charge, she's dead." Moormann told the officers that he had called the prison because he was afraid they might be mad that his mother was not with him, and that he had just "lost his cool" when his mother made him "take his father's place" and "do things he just couldn't handle." The officers took Moormann to the police station where, after being read his Miranda warning, he confessed to killing his mother and dismembering her body. The full text of the confession is included as an appendix to this opinion.

The police obtained a warrant to search Moormann's room at the Blue Mist, where they found bedding stained with Roberta's blood; towels, a washcloth, and a cooking pot stained with blood; bloodstains on the bathroom walls and

floor; a scouring pad with bloodstains and human tissue; and a buck knife and steak knife. They also found Roberta's brassiere hanging in the closet with five hundred dollars in cash safety-pinned to it.

In trash dumpsters at and near the motel, the police officers found trash bags containing Roberta's thorax, head, pelvic area, feet and hands, and muscle and skin cut from her limbs as well as torn strips of towel, a razor, the package in which the steak knife was sold, and some pajamas. The police found a finger in the sewer.

A search of Moormann's living quarters in the prison revealed a notebook of bizarre writings, including instructions to train a dog to make bank deposits, a document entitled "last will and testament" that purported to transfer Roberta's estate to Moormann in exchange for shares in his business, and a letter purporting to be from Roberta explaining why she was making the transfer. Roberta's actual will left her entire estate to Moormann, but stated her belief that he was not competent to handle his own affairs and placed the money in trust for his benefit. The executor of Roberta's estate testified that Roberta was planning to move to Oklahoma to be with her remaining relatives in April 1984, which happened to be the next time that Moormann was up for parole.

The medical examiner testified that Roberta had died of asphyxiation as a result of something being held on her face and blocking her air supply. He testified that, between twelve hours and one half-hour prior to her death, she had sustained bruises as the result of moderate force from a fist or blunt object on her left upper arm, both breasts, and on her lower back. He also testified that, between two hours and one half-hour before her death, Roberta was cut by a knife or other sharp, pointed object once on her right breast and five times on her right buttock. The medical examiner found no defensive wounds on Roberta's hands and found no marks indicating that her wrists or ankles were bound. However, her hands

had been cut from her wrists and her feet from her ankles, so any such marks may have been impossible to find. The medical examiner did find bruises in and around Roberta's mouth consistent with being gagged. The medical examiner noted that the dismemberment of the body was very meticulous, particularly the cutting off of the hands at the wrist, the feet at the ankles, and then the fingers at the knuckles. The entire process would probably have taken two hours. The medical examiner found no evidence of sexual activity, and tests run on the sheets and bedspread found no evidence of semen. While the medical examiner could determine that Roberta was alive when she was bruised and cut, he could not tell whether she was conscious, but noted that the cuts would have been painful if she was conscious.

Numerous lay witnesses testified that Moormann was odd, that he switched conversational topics frequently and seemed not all there or off in another world. A woman with whom Moormann stayed while he was on parole testified that he would dress normally during the day, but wear only black at night; that he claimed to have ties to the mafia; and that although his mother supported him generously, he was unsuccessful in his business affairs. His parole officer testified that Moormann failed to adjust to the outside world because of frequent fantasies that interfered with daily activities. The parole officer testified that, despite his mother's generous support, Moormann was unable to succeed in business because he was not intellectually capable of success. At the time that Moormann's parole was revoked, his parole officer recommended that he be hospitalized, rather than returned to prison. The parole officer did state, however, that he was never sure whether Moormann was incompetent or whether he was a con man. Many of the people with whom Moormann interacted on that Friday reported statements that Moormann made about his business dealings and family affairs that were untrue. He told the clerk who sold him the buck knife that it was a gift for his son, mentioned his dead father to several people as though he was alive and visiting Moormann on this

furlough, and told the liquor store clerk that he was married and that his mother had recently died of cancer.

The defense called one expert witness, Dr. Overbeck, a psychologist who interviewed Moormann for almost ten hours in five sessions, gave him psychological tests, and reviewed his lengthy medical history and school and prison records. Dr. Overbeck concluded that Moormann suffers from organic delusional syndrome, pedophilia, and schizoid personality disorder, and that he was unable to appreciate the nature and consequences of his actions when he killed his mother. Dr. Overbeck also noted that a delusional diagnosis is difficult because it depends on whether or not you believe Moormann's allegations of an incestuous relationship with his mother.

The state called three expert witnesses. Dr. Cleary, a court-appointed expert psychiatrist, diagnosed Moormann as suffering from pedophilia and antisocial personality disorder. Dr. Cleary stated that he did not believe that Moormann was unable to understand and appreciate the nature of his actions, although his subsequent knowledge of Moormann's bizarre writings and some of his statements on the day of the crime made him less certain of his conclusion. Dr. Tuchler, a board-certified forensic psychiatrist who had diagnosed Moormann on four prior occasions beginning in his teens, testified that Moormann does not suffer from organic delusional syndrome. Dr. Tuchler testified that Moormann is a pedophile with anti-social personality disorder, but that he is capable of understanding the nature of his actions. However, Dr. Tuchler believed Moormann, who told him that he had an incestuous relationship with his mother, that he had sex with her that night, that she wanted her breasts pinched, and that she was making noises and he put a pillow over her face so that he would not hear her. Dr. Tuchler testified that he believed Roberta's death was accidental. Dr. Buchsbaum, a board-certified neurologist who examined Moormann, testified that

while he found no evidence of an organic brain defect, he could not rule out the possibility.

After two hours of deliberation, the jury found Moormann guilty of first-degree murder, rejecting his insanity defense. The trial judge received a pre-sentencing report and held a sentencing hearing, at which Moormann's counsel argued that Moormann's inability to fully understand his actions and record of good conduct in prison weighed in favor of a life sentence. The trial judge found three statutory aggravating factors (prior life sentence, pecuniary motive, and cruel, heinous, or depraved murder) and one mitigating factor (diminished ability to understand actions) and sentenced Moormann to death. After an unsuccessful direct appeal to the Arizona Supreme Court and two unsuccessful state post-conviction relief petitions, Moormann filed this federal habeas corpus petition.

There are, from a procedural standpoint, essentially three different categories of claims before us. The first are claims that the district court rejected on the merits after concluding that they had been properly exhausted. We affirm the district court on the merits of those claims. The second are claims that the district court properly refused to hear because of procedural irregularities in presentation to the state court. We affirm the dismissal of those claims. The third category are claims for which we conclude the petitioner has established sufficient cause to excuse the procedural irregularities in presentation to the state court. We vacate the district court's judgment and remand for further proceedings on a limited number of claims falling into the third category.

## II.   CLAIMS THE DISTRICT COURT REACHED ON THE MERITS

Moormann raised four claims that the district court denied on the merits: whether he was provided a full and fair opportunity to litigate his Fourth Amendment claims; whether the

state courts constitutionally applied two aggravating factors in imposing his death sentence; whether his counsel was ineffective for failing to argue proportionality in his direct appeal; and whether the state courts properly considered all mitigating evidence. We affirm the district court's judgment on these issues.

*Fourth Amendment*

**[1]** Moormann challenges the validity of the search warrant pursuant to which the Florence police officers searched his hotel room. The Fourth Amendment requires that a search warrant specify the items to be seized with sufficient precision for the person conducting the search to identify the items for which seizure is authorized. *United States v. Stubbs*, 873 F.2d 210, 211 (9th Cir. 1989). The warrant pursuant to which the Florence police searched Moormann's hotel room did not indicate what items were to be seized, but the affidavit supporting the warrant did describe the items in detail. The trial court found that, while the affidavit was not attached to the warrant, the officer who executed the affidavit was present for all material parts of the search. The court therefore admitted all material evidence described in the appropriately limiting affidavit. *See Center Art Galleries-Hawaii, Inc. v. United States*, 875 F.2d 747, 750 (9th Cir. 1989), *overruled on other grounds by J.B. Manning Corp. v. United States*, 86 F.3d 926, 927 (9th Cir. 1996). The Arizona Supreme Court affirmed, relying on these same factual findings and holding that any evidence outside the proper scope of the warrant that the trial court admitted was harmless in light of its insignificance to the case and the overwhelming evidence of Moormann's guilt. *Moormann*, 744 P.2d at 684-85.

**[2]** If the state has provided a state prisoner an opportunity for full and fair litigation of his Fourth Amendment claim, we cannot grant federal habeas relief on the Fourth Amendment issue. *Stone v. Powell*, 428 U.S. 465, 494 (1976). Moormann contends that he did not have a full and fair opportunity to liti-

gate his warrant challenge because the state court's factual findings are not supported by the evidence. Moormann was provided a full and fair opportunity to litigate his state claims, however. He raised the warrant issue in a pre-trial motion; the trial court held a hearing on the issue at which Moormann was allowed to present evidence and examine witnesses; the trial court made a factual finding, and appropriately limited the admissible evidence to that described in the warrant affidavit; and the Arizona Supreme Court reviewed the trial court's decision. *Cf. Abell v. Raines*, 640 F.2d 1085, 1088 (9th Cir. 1981). The district court did not err in denying Moormann's petition.

*Aggravating Factors*

Moormann alleges that the state courts did not constitutionally apply certain aggravating factors in the Arizona death penalty statute because the record does not support the finding of those factors. Moormann specifically objects to the state courts' application of two aggravating factors — that the murder was committed for pecuniary gain, and that the murder was particularly cruel, heinous, or depraved. Ariz. Rev. Stat. § 13-703(F)(5), (F)(6).

Federal habeas review of a state court's application of aggravating factors is limited to determining whether the state court's finding "was so arbitrary or capricious as to constitute an independent due process or Eighth Amendment violation." *Lewis v. Jeffers*, 497 U.S. 764, 780 (1990). We examine whether, "viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.* at 781 (emphasis in original) (internal quotations and quotations omitted).

[3] Under Arizona law, a finding that a murder was motivated by pecuniary gain for purposes of section 13-703(F)(5) must be supported by evidence that the pecuniary gain was

the impetus for the murder, not merely the result of the murder. *State v. Kayer*, 984 P.2d 31, 41 (Ariz. 1999). The evidence presented at Moormann's trial and sentencing hearing was conflicting. Several witnesses testified that Roberta had supported Moormann generously, pouring tens of thousands of dollars into unsuccessful business ventures, and that Roberta was supportive of and had a close relationship with her adoptive son. The police found five hundred dollars in cash undisturbed in Roberta's brassiere, which was found hanging in the closet of the room where she was killed. The executor of Roberta's estate, however, revealed that her will left her estate in trust to Moormann because she believed he was not competent to handle his own affairs, and that Roberta was planning to move to Oklahoma to be with relatives. Moormann's parole officer testified that it would have been possible for Moormann to be paroled to Oklahoma, but only if his mother agreed to be responsible for him there. A search of Moormann's prison living quarters revealed a handwritten document, in a notebook of other writings, entitled "last will and testament." That forged document purported to transfer all of Roberta's property to Moormann in exchange for two hundred shares of stock in his business. The notebook also contained a letter purporting to be from Roberta to Moormann, explaining why she wanted to make the transfer. A reasonable fact-finder could have found that Moormann murdered Roberta for pecuniary gain.

**[4]** The (F)(6) aggravating factor, that the murder was committed in an especially cruel, heinous, or depraved manner, is disjunctive, and need only be supported by evidence of one of the three. *State v. Hyde*, 921 P.2d 655, 683 (Ariz. 1996). In this case, the trial and appellate courts seem to have relied upon cruelty, rather than heinousness or depravity. To find cruelty, the court must find beyond a reasonable doubt that the victim was conscious during the attack and that the defendant knew or should have known that the victim would suffer. *State v. Trostle*, 951 P.2d 869, 883 (Ariz. 1997). The Arizona courts have upheld findings of cruelty based on a showing

that the victim suffered mental anguish or fear. *State v. Wallace*, 728 P.2d 232, 237 (Ariz. 1986). The medical examiner testified that Roberta had been bruised and cut in the hours before her death, and that these bruises and particularly the larger cuts would have been painful if she was conscious when they were inflicted. The medical examiner was not able to determine whether Roberta was conscious when they were inflicted, nor was he able to find evidence that Roberta's wrists or ankles had been bound. The medical examiner did find bruises in and around Roberta's mouth consistent with being gagged, and the police found strips of bloody, torn towel in the trash bins where Moormann disposed of Roberta's body. In Moormann's confession, he told the police that he and Roberta had argued, that he had hit her during the argument, that he had tied her up, and that she had continued to talk to him while she was tied up until he held a pillow over her face and suffocated her. Moormann also mentioned, in his confession, that he disposed of a razor blade that he had used to cut Roberta. On the basis of this evidence, a rational factfinder could have found beyond a reasonable doubt that Roberta suffered physical and/or mental anguish before she died. We affirm the district court's denial of Moormann's habeas petition on these sentencing issues.

*Ineffective Assistance of Counsel on Direct Appeal in Failing to Present Proportionality Argument*

[5] In order to establish that counsel's assistance was sufficiently defective to require reversal, the defendant must show that counsel's performance was deficient and that the deficiency prejudiced the defendant. *Strickland v. Washington*, 466 U.S. 668, 686 (1984). Moormann argues that he was prejudiced by his counsel's failure to argue that his death sentence was disproportionate. At the time of Moormann's appeal, the Arizona Supreme Court considered the proportionality of each death sentence as part of its independent review of the propriety of death sentences. *State v. White*, 815 P.2d 869, 884 (Ariz. 1991). This process was so inexact and problem-

atic, however, that the court abandoned it in 1992. *State v. Salazar*, 844 P.2d 566, 583-84 (Ariz. 1992). This alone suggests that Moormann's appellate counsel made a reasonable tactical choice in omitting this argument, particularly given the disturbing nature of Moormann's crime. In addition, the Arizona Supreme Court actually conducted a proportionality review *sua sponte* as part of its independent review of Moormann's sentence. *Moormann*, 744 P.2d at 688. Therefore, even if Moormann's counsel was deficient in failing to present proportionality arguments on review, he was not prejudiced by this failure. We affirm the district court's denial of relief on this ground.

*Failure to Consider Mitigating Evidence*

[6] Moormann also contends that the state courts failed to "consider and give effect to all relevant mitigating evidence" that he offered, in violation of the Eighth Amendment. *Eddings v. Okla.*, 455 U.S. 104, 110 (1982). However, the trial court need not exhaustively analyze each mitigating factor "as long as a reviewing federal court can discern from the record that the state court did indeed consider all mitigating evidence offered by the defendant." *Clark v. Ricketts*, 958 F.2d 851, 858 (9th Cir. 1992)(citation omitted).

[7] Moormann contends that the trial court failed to consider his ability to adapt to prison life and his childhood and family background. Although Moormann's counsel did not expressly argue that this evidence, which was contained in the trial and sentencing record, constituted mitigation, the trial court explicitly stated that it would consider all evidence presented at trial, in the pre-sentencing report, and at sentencing in rendering its sentencing decision. This court may not engage in speculation as to whether the trial court actually considered all the mitigating evidence; we must rely on its statement that it did so. *Smith v. McCormick*, 914 F.2d 1153, 1166 (9th Cir. 1990).

## III.  CLAIMS THAT WERE NOT EXHAUSTED AND ARE PROCEDURALLY BARRED

Moormann raised the following claims in his habeas petition, and urges this court to order the district court to address their merits, even though he did not raise them in any of his state court proceedings. These claims are procedurally barred.

*Ineffective Assistance of Counsel at Trial*

[8] In his habeas petition, Moormann argued that his trial counsel was ineffective because he called only one expert witness to support Moormann's insanity defense, because trial counsel elicited prejudicial information from that witness, and because counsel failed to provide that witness with critical information on Moormann's background. (The district court denominated this claim 12A.) The district court found that this claim had never been presented in state court. Moormann contends that the operative facts of this claim were identified in the trial court, and that he argued in his second petition for post-conviction relief (PCR) his trial counsel's ineffectiveness for presenting his insanity defense through only one expert. Moormann did not claim, in either his direct appeal to the Arizona Supreme Court or in his first PCR, that his counsel was ineffective in presenting the insanity defense. Because Moormann could have presented this claim in those proceedings, Arizona Rule of Criminal Procedure 32.2 barred its review in future state proceedings. Even in his second Rule 32 petition, he failed to establish that there was any available expert witness who could have materially assisted the defense.

Moormann also alleges that his trial counsel was ineffective as a result of:

• counsel's refusal to allow Moormann to testify (claim 12D in the district court)

- counsel's refusal to stipulate to the victim's identity and the resulting introduction of a photograph of the victim's severed head (claim 12E in the district court)

- counsel's failure to object to irrelevant and prejudicial information about the victim (claim 12F in the district court)

- counsel's failure to object to prosecutorial misconduct (claim 12G in the district court)

- counsel's failure to request a jury instruction that the jury should consider the elements of the crime before considering insanity or to object to the prosecutor's contrary suggestion in closing arguments (claim 12H in the district court)

[9] Moormann contends that the facts of these claims were present in the state record and that they are fundamentally the same as the claims he did present in state court — that his "counsel was ineffective for failing to investigate and present a viable defense." He does not contend that these more specific claims were presented in any state proceeding, and indeed they were not.

Moormann points out that we have held that, so long as the petitioner presented the factual and legal basis for his claims to the state courts, review in habeas proceedings is not barred. *E.g.*, *Chacon v. Wood*, 36 F.3d 1459, 1467-68 (9th Cir. 1994). This does not mean, however, that a petitioner who presented any ineffective assistance of counsel claim below can later add unrelated alleged instances of counsel's ineffectiveness to his claim. *See Carriger v. Lewis*, 971 F.2d 329, 333 (9th Cir. 1992) (en banc). Rather, this rule allows a petitioner who presented a particular claim, for example that counsel was ineffective in presenting humanizing testimony at sentencing, to develop additional facts supporting that particular claim. *See Weaver v. Thompson*, 197 F.3d 359, 364 (9th Cir. 1999).

Moormann did not present these claims of ineffective assistance in state court, and we cannot address them on habeas review.

*Ineffective Assistance of Sentencing Counsel*

Moormann asserts that his sentencing counsel was ineffective for:

- failing to present evidence or argument that Moormann was severely mentally ill and the victim's death was accidental, neither motivated by a desire for pecuniary gain nor cruel, heinous, and depraved (claim 16D in the district court)

- failing to object to certain opinions of the victim's family (claim 16E in the district court)

- failing to object to the trial court's restriction on mitigation (claim 16F in the district court)

- failing to object to information in the pre-sentence report or provide information for the report (claim 16G in the district court)

Moormann contends that the substance of these claims was presented in his first PCR, in his allegation that his counsel failed to represent him adequately at sentencing. Moormann's first PCR claimed that his sentencing counsel was ineffective for failing to call witnesses who would testify to his "character and upbringing" and refusing to allow Moormann to testify in an attempt to mitigate the impact of his prior conviction. These claims were neither covered by the arguments of the first PCR nor asserted in the second PCR. Because these claims were never presented in any state court proceeding, they cannot be addressed by the federal courts. The district court's dismissal of these claims was proper.

*Issues Moormann Argues Were Exhausted by Fundamental Error Review*

At the time of Moormann's direct appeal, the Arizona Supreme Court was required by statute to review independently the trial record for fundamental errors affecting the judgment and sentence, whether or not the defendant alleged those errors on appeal. Ariz. Rev. Stat. § 13-4035 (1987) (repealed); *State v. Brewer*, 826 P.2d 783, 790 (Ariz. 1992). The Arizona Supreme Court conducted this review in Moormann's case. *Moormann*, 744 P.2d at 684 (reviewing the validity of the search warrant even though Moormann did not raise it on appeal because of the court's "duty to search the record for fundamental error"). Moormann asserts that this independent review by the Arizona Supreme Court constitutes full and fair presentation of his federal claims and that several of them are therefore not procedurally defaulted.[1] We have explicitly rejected this argument. *Martinez-Villareal v. Lewis*, 80 F.3d 1301, 1306 (9th Cir. 1996); *Poland v. Stewart*, 117 F.3d 1094, 1105 (9th Cir. 1997). Where the parties did not mention an issue in their briefs and where the court did not mention it was considering that issue *sua sponte*, there is no evidence that the appellate court actually considered the issue, regardless of its duty to review for fundamental error, and the issue cannot be deemed exhausted.

---

[1]Moormann makes this argument with respect to his claims of inadequate jury voir dire (claim 5 below); inadequate, burden-shifting jury instructions on the insanity issue (claim 6 below); prosecutorial misconduct (claim 9 below); and "record-based" ineffective assistance of counsel claims, by which he seems to mean 12B (failure to present alternative defense), 12E (failure to stipulate to victim's identity), 12F (failure to object to irrelevant and prejudicial information about the victim), 12G (failure to object to prosecutorial misconduct), 12H (failure to request correct jury instructions on insanity).

*Issues Moormann Argues Were Exhausted by Arizona's Mandatory Independent Review of Death Sentences*

At least as of the time of Moormann's direct appeal, the Arizona Supreme Court independently reviewed the propriety of all death sentences, examining the trial court's findings on aggravating and mitigating factors and independently reweighing those factors to determine whether the death sentence is appropriate. *State v. Watson*, 628 P.2d 943, 945-46 (Ariz. 1981). Moormann contends that this independent review served to exhaust the following claims: that his counsel was ineffective at sentencing; that two of the aggravating factors are unconstitutional; that prejudicial information was considered at sentencing; that he was denied a jury trial on facts that increased his sentence; that the Arizona statute fails to adequately channel sentencing discretion; that the Arizona statute contains an unconstitutional presumption of death; that the Arizona statute unconstitutionally mandates a sentence of death; that the death penalty is cruel and unusual punishment; that the Arizona death penalty is discriminatory; that the Arizona Supreme Court failed independently to review and reweigh mitigation and aggravation evidence; and that the death sentence is imposed arbitrarily and capriciously. These issues are not included in the scope of the Arizona Supreme Court's independent review of the death sentence as defined by that court, and therefore were not exhausted.

## IV.  CLAIMS WHERE PETITIONER HAS SHOWN CAUSE

Moormann was represented by three different attorneys in his state proceedings: Thomas Kelly at trial, Robert Cimino on direct appeal and during his first petition for post-conviction relief (PCR), and Allen Gerhardt during his second PCR. In the first PCR, prepared by Cimino, Moormann alleged a number of errors at trial and sentencing that were not included in his direct appeal to the Arizona Supreme Court. The trial court dismissed Moormann's first PCR for

this reason, because Arizona Rule of Criminal Procedure 32.2 bars the assertion, in a PCR proceeding, of any claim that could have been part of a prior proceeding. Cimino then moved the court for the appointment of another attorney who would be able to assert that Cimino was ineffective in failing to raise these issues in the direct appeal. The trial court refused, but did appoint another attorney, Gerhardt, when Moormann filed a second PCR pro se. Gerhardt filed an amended second PCR petition, in which he alleged that Cimino was ineffective for failing to file an adequate motion for reconsideration after the first PCR petition was denied, for failing to appeal denial of the first PCR petition, and for failing to present certain other, specifically enumerated, issues of alleged error at trial and sentencing. The state court denied the second PCR on Rule 32.2 grounds.

Moormann now contends that Cimino could not have argued his own ineffectiveness in the first PCR proceeding, and that the trial court's failure to appoint a new attorney to argue that Cimino's ineffectiveness constitutes cause for the default of those issues Cimino did not raise in Moormann's direct appeal.

[10] A prisoner who fails to comply with state procedures cannot receive federal habeas corpus review of a defaulted claim unless the petitioner can demonstrate either cause for the default and resulting prejudice, or that failure to review the claims would result in a fundamental miscarriage of justice. *Coleman v. Thompson*, 501 U.S. 722, 750 (1991). "Cause" must be something external to the petitioner. *Id.* at 753. Attorney ignorance or inadvertence is not cause, but attorney error rising to the level of an independent constitutional violation (in the form of ineffective assistance of counsel) does constitute cause. *Id.* at 753-54. In several cases, we have rejected arguments similar to Moormann's on the ground that, because there is no Sixth Amendment right to counsel in state post-conviction proceedings, there can be no independent constitutional violation as a result of post-conviction

counsel's incompetence. *See Ortiz v. Stewart*, 149 F.3d 923, 933 (9th Cir. 1998); *Nevius v. Sumner*, 105 F.3d 453, 459-60 (9th Cir. 1996); *Martinez-Villareal*, 80 F.3d at 1306. *Moran v. McDaniel*, 80 F.3d 1261, 1271 (9th Cir. 1996); *Bonin v. Calderon*, 77 F.3d 1155, 1159 (9th Cir. 1996).

[11] Moormann's claim that cause excuses his procedural default is, however, not grounded on allegations of Cimino's ineffectiveness in his role as Moormann's counsel during his first PCR petition. Rather, the claim is grounded in allegations that Cimino was ineffective when serving as Moormann's counsel on direct appeal, for failing to raise various issues that the state courts later found precluded because they were not raised on direct appeal. There is a Sixth Amendment right to counsel during a criminal defendant's appeal as of right. *McCoy v. Court of Appeals of Wis.*, 486 U.S. 429, 436 (1988). Therefore, if Cimino was constitutionally ineffective in failing to present these claims on direct appeal, Moormann may have demonstrated cause sufficient to overcome the procedural bar. *Cf. Manning v. Foster*, 224 F.3d 1129, 1135-36 (9th Cir. 2000). Cimino was not trial counsel and should have had no conflict of interest in raising ineffective claims on direct appeal. He was, however, conflicted in the presentation of the first PCR petition, because he had been counsel on direct appeal.

Moormann raises a number of issues he claims Cimino was ineffective in failing to present on direct appeal.[2] If Moormann had, after the denial of his first PCR petition, come into

---

[2]Those issues are, according to Moormann's brief: inadequate voir dire, gruesome photographs, jury instructions, denial of right to rebut evidence, prosecutorial misconduct, right to testify, incomplete record, incompetent trial and sentencing counsel, unconstitutional (F)(5) and (F)(6) aggravating factors, consideration of prejudicial information at sentencing, denial of jury trial on facts that increase the sentence, failure to channel sentencing discretion, death sentence cruel and unusual punishment, and failure to independently review mitigation and aggravation and reweigh those factors.

federal court and asserted on habeas review that Cimino was incompetent in failing to raise those issues during either direct appeal or the first PCR, the procedural bar to the claims of ineffectiveness on Cimino's part may have been excused for cause. Instead, after Moormann's first PCR petition was denied as procedurally barred, Cimino filed a motion, in state court, asking for the appointment of new counsel to assert Cimino's ineffectiveness in failing to raise those claims on direct appeal. The trial court at that time refused. When Moormann filed a second, pro se, PCR petition, the trial court appointed a different attorney to represent him, one who was not conflicted in raising Cimino's ineffectiveness. That counsel filed an amended second PCR petition, in which he alleged that Cimino was ineffective for failing to file an adequate motion for reconsideration after the first PCR petition was denied, for failing to appeal denial of the first PCR petition, and for failing to present certain other, specifically enumerated, issues of alleged error at trial and sentencing. Insofar as Cimino was ineffective for failing to present the issues raised in the first and second PCR petitions during Moormann's direct appeal, such ineffectiveness does not excuse Moormann's failure to include, in his second PCR petition, the additional claims of trial and sentencing counsel's ineffectiveness, that were raised for the first time in his habeas petition.

[12] Therefore, we conclude that Moormann has sufficiently asserted cause to excuse the procedural default of those claims that were presented in his first and second PCR. These claims include, but are not limited to, the following:

1.   That trial counsel was ineffective for failing to present available evidence that Moormann's statements to the police were not voluntary because of his mental illness (claim 12C in the district court)

2.   That his sentencing counsel was ineffective for failing to investigate and call witnesses who could testify to Moor-

mann's background and childhood (16A, B, and C in the district court)

3. That his sentencing counsel was ineffective for refusing to allow Moormann to testify at sentencing to mitigate his prior conviction (claim 16H in the district court)

4. That appellate counsel was ineffective for failing to present (and thereby both exhaust and save from procedural bar) the following issues:

   a. Counsel's ineffectiveness at trial and sentencing in the respects described above

   b. That Moormann's right to a jury trial on all facts that increased his sentence was violated by Arizona's practice of judge sentencing

   c. That the Arizona death penalty statute fails to guide the sentencer

   d. That the death penalty is cruel and unusual punishment both generally and as applied in Moormann's case

[13] Cimino's failure to raise these claims constitutes "cause" sufficient to lift the state procedural bar only if he was indeed ineffective in failing to raise them, i.e., if the failure prejudiced Moormann. Claims 4c and 4d have been repeatedly rejected by the Arizona courts. *See State v. Sansing*, 26 P.3d at 1118, 1131-32 (Az. 2001). If the law on those issues changes, Moormann can file an additional PCR in Arizona state court to address the effect of the legal change on his case. Ariz. R. Crim. P. 32.2. Cimino's failure to raise these issues could not have prejudiced Moormann.

[14] We vacate and remand the other claims listed above, along with any other colorable claims in Moormann's first

and second PCR, to the district court for further proceedings to determine whether there was prejudice to Moormann in Cimino's failing to raise those claims on direct appeal. If the district court determines that there was prejudice, Moormann will have sufficiently shown cause and prejudice to excuse his procedural default of those claims, and the district court may determine their merits.

AFFIRMED IN PART, VACATED IN PART, and REMANDED.

APPENDIX

CAPT. HORRALL: Okay now, we'll begin (inaudible) . . . I'll let you guys take case (inaudible) . . . (inaudible - noise).

Okay Robert, you've already been advised of your Miranda rights, uh, however, I'm gonna' tape record, and since you feel the need to discuss this, apparently since you've made several statements, you can go ahead and, if you want to, just — you can tell us anything you'd like at this time. Officer Thuesen needs to read you your rights first. Okay, Don?

OFFICER THUESEN: Okay. You have the right to remain silent. Anything you say can and will be used against you in a court of law. You have the right to talk to a lawyer and have him present with you while you are being questioned. If you cannot afford to hire a lawyer, one will be appointed to represent you for any questions if you wish. If you decide at any time to exercise these rights and not answer any questions or make any statements. Okay, Robert, do you understand each of these rights as explained to you?

ROBERT MOORMANN: Yes, I do.

OFFICER THUESEN: Okay, having these rights in mind, do you wish to talk to us?

OFFICER THUESEN: Okay, having these rights in mind, do you wish to talk to us?

ROBERT MOORMANN: Yes, I do.

OFFICER THUESEN: Okay, uh, time is now 0318 on, uh, Saturday, January 14th, 1984.

CAPT. HORRALL: Okay, Robert, would you — present during this interview will be, uh, Officer Don Thuesen, Captain T.J. Horrall and Robert Moormann.

ROBERT MOORMANN: Robert Henry Moormann.

CAPT. HORRALL: Robert Henry Moormann. Would you like to tell us what happened today?

ROBERT MOORMANN: Well, my mom and I had a — we had a argument, and during it I hit her a few times, and then it got worse and I — I lost my cool and — and I tied her up, and she kept on me, talkin' about things that, uh, pertained to my real family and, I don't remember the exact time, and I suffocated her. Then I took the 409 and went into the wash room. I panicked, at which time I dissected her.

CAPT. HORRALL: Where did you do that at?

ROBERT MOORMANN: In the sh-shower and tub.

OFFICER THUESEN: Was that this morning, Robert?

ROBERT MOORMANN: Yes, sir.

OFFICER THUESEN: Now you told me earlier when we were trying to find her that, uh, you know, while — while she was missing that, uh, you got up about 6:30 or 7:00 o'clock; is that about the time you got up?

ROBERT MOORMANN: I never went to bed.

OFFICER THUESEN: You never went to bed last night?

ROBERT MOORMANN: (No answer)

OFFICER THUESEN: That would have been on the, uh, night of the 13th?

ROBERT MOORMANN: Yes, sir. Night of the 12th.

OFFICER THUESEN: Night of the 12th?

ROBERT MOORMANN: Yes, sir.

OFFICER THUESEN: Friday night or Thursday night?

ROBERT MOORMANN: Thursday.

OFFICER THUESEN: Thursday night. That would have been the night of the 12th. Uh, did your mother stay up all night, too?

ROBERT MOORMANN: Yes, sir.

OFFICER THUESEN: Okay, uh, was it sunup yet? Do you know, uh, Robert?

ROBERT MOORMANN: I — I didn't get to check.

OFFICER THUESEN: Didn't pay any attention. Did you, uh, what — what did you use to suffocate her?

ROBERT MOORMANN: A pillow.

OFFICER THUESEN: Okay. Was that, uh — was she in the bed, Robert?

ROBERT MOORMANN: The bed closest to the bathroom.

OFFICER THUESEN: On the bed closest to the bathroom. Okay. And then you, uh, you held a pillow over her face?

ROBERT MOORMANN: Yeah, and kept it until she was dead.

OFFICER THUESEN: You had — you had tied her up before then?

ROBERT MOORMANN: Yes.

OFFICER THUESEN: What did you tie her up with, Robert?

ROBERT MOORMANN: I tore a towel up.

OFFICER THUESEN: Tore a towel up? What did you — what did you do with the towel after?

ROBERT MOORMANN: I threw it away this morning.

CAPTAIN HORRALL: You threw that away this morning? Do you know where you threw it?

ROBERT MOORMANN: Yes. It's probably in one of those bins where the maids put the stuff.

OFFICER THUESEN: Okay. Did you, you throw it in the trash in the, uh, room there?

ROBERT MOORMANN: I — I gave it to the maid in — it was in a plastic bag I gave the maid this morning.

OFFICER THUESEN: You gave the maid a plastic bag this morning?

ROBERT MOORMANN: Yeah, when I to — when I to — when I told 'em that my mom was sick and didn't want to be disturbed, and they didn't — instead of, instead of going inside, they had me hand 'em the stuff.

OFFICER THUESEN: Okay, was there anything else in the bag that you handed the maid?

ROBERT MOORMANN: A razor blade that I used to cut 'er with. I had torn one of the razors I had apart.

OFFICER THUESEN: Uh, the — there was just, uh, there was just trash and some, uh — was there bloody material or anything in the bag?

ROBERT MOORMANN: No.

OFFICER THUESEN: Just the parts of the towel and a piece of razor or one of the razors?

ROBERT MOORMANN: There might be — I can't remember if I put that one piece of towel that was kind of bloody in there or not. There might be. I can't remember.

OFFICER THUESEN: Okay, uh —

CAPTAIN HORRALL: Okay, uh, Robert, after you suffocated her, uh, then what happened?

ROBERT MOORMANN: I untied 'er and let 'er lay there for awhile. Then I knew I had to do something because I knew that Baker and Mrs. Southworth was gonna' be there.

CAPTAIN HORRALL: Did she show up at one o'clock?

ROBERT MOORMANN: Yes.

CAPTAIN HORRALL: Okay. What did you do before she showed up?

ROBERT MOORMANN: That's when I dissected my mom.

CAPTAIN HORRALL: Okay. When did you, uh — when you did that then what did you do — how did you dispose of 'er?

ROBERT MOORMANN: I went down and bought some plastic bags from, uh, the grocery store.

CAPTAIN HORRALL: From U-Totem er —

ROBERT MOORMANN: Yes, and I used the knife you have, so on. And if you look in the fan, the one that's against the

far wall, there's some — there's some little holes on — on top.

CAPTAIN HORRALL: Uh-huh.

ROBERT MOORMANN: You'll find the steak knife that I used to cut the bones.

CAPTAIN HORRALL: Okay.

OFFICER THUESEN: Do you know — do you recall how many bags, uh, you had to use, Robert?

ROBERT MOORMANN: No.

OFFICER THUESEN: Okay.

ROBERT MOORMANN: But I know that on some of the parts I doubled.

OFFICER THUESEN: You doubled the bags or, uh, you used two bags on some parts?

ROBERT MOORMANN: But then I decided at first I'd just cut 'er, just — and put the — put the arms and legs into bags and then later on I decided — I knew if I could — it would be easier to dispose of 'er; then I dissected her completely. That's when I panicked and that's the reason I wanted to talk to the Major. There's something I'll tell him.

OFFICER THUESEN: Okay.

ROBERT MOORMANN: But I would —

OFFICER THUESEN: Go ahead.

ROBERT MOORMANN: I would like to have — you two can be there. I — this part I'd like to have off this record.

OFFICER THUESEN: Okay.

OFFICER HORRALL: Okay.
(Off the record discussion)

OFFICER HORRALL: Did you flush anything down the toilet?

ROBERT MOORMANN: Yes.

CAPTAIN HORRALL: What did you flush down the toilet?

ROBERT MOORMANN: Nine fingers.

CAPTAIN HORRALL: Fingers?

ROBERT MOORMANN: Yes.

CAPTAIN HORRALL: Okay. Is that all?

ROBERT MOORMANN: Yes, sir.

OFFICER THUESEN: Robert, you said nine fingers?

ROBERT MOORMANN: The tenth one I did this afternoon.

OFFICER THUESEN: Now, you say you did this afternoon. What do you mean by that?

ROBERT MOORMANN: I was, uh, when I was cuttin' 'em off I lost one of 'em.

OFFICER THUESEN: I see.

ROBERT MOORMANN: And this afternoon I found that.

CAPTAIN HORRALL: Did you flush it also?

ROBERT MOORMANN: Yes.

CAPTAIN HORRALL: Okay.

OFFICER THUESEN: Do you — do you recall how many trips, uh, you made to, uh, any of the, uh, trash areas with bags?

ROBERT MOORMANN: Not that I remember. Uh, about four.

OFFICER THUESEN: About four.

ROBERT MOORMANN: 'Cause I didn't want people to know what I was doing.

OFFICER THUESEN: I see.

CAPTAIN HORRALL: After — wha — what clothes — where are the clothes that you had on when you did this?

ROBERT MOORMANN: Nothin'.

CAPTAIN HORRALL: No clothing?

ROBERT MOORMANN: Nothin'.

CAPTAIN HORRALL: You didn't have any clothes on when you did this?

ROBERT MOORMANN: No.

CAPTAIN HORRALL: Did you want to talk to the Major now?

ROBERT MOORMANN: Whenever he wants to, yeah.

CAPTAIN HORRALL: Okay. This concludes the interview. It is 0236 a.m.