744 P.2d 679

**The STATE of Arizona, Appellee,**

v.

**Robert Henry MOORMAN, Appellant.**

**No. 6558.**

Supreme Court of Arizona.

Oct. 6, 1987.

Robert K. Corbin, Atty. Gen. by William J. Schafer III, Georgia B. Ellexson, Asst. Attys. Gen., Phoenix, for appellee.

Robert Cimino, Apache Junction, for appellant.

FELDMAN, Vice Chief Justice.

Defendant, Robert Henry Moorman, challenges both his conviction and his sentence for first degree murder. We have review of this automatic appeal pursuant to Ariz. Const. art. 6, § 5(3) and A.R.S. §§ 13–4031 and –4033.

## FACTS

On January 12, 1984, Moorman, an inmate of the Arizona State Prison at Florence,[1] was released to his 74–year–old adoptive mother, Roberta Claude Moorman, for a three-day compassionate furlough. The two were staying in room 22 of the Blue Mist Motel, close to the prison. The following evening, George Johnson, owner of a pizza restaurant near the motel, told two police officers, Donald Thuesen and Keith Hyland, that Moorman had asked if he could dispose of some "cow guts" in the restaurant's dumpster. Johnson, who had worked at the prison and knew Moorman, was suspicious of Moorman's "guilty look." Johnson also mentioned to the officers that Moorman had said his mother was ill.

Officers Thuesen and Hyland confirmed Moorman's furlough status with prison personnel. They learned that Moorman was staying with his mother at the Blue Mist Motel. After checking several dumpsters and discovering nothing out of the ordinary, at about 11:00 p.m. the officers decided to look in on Moorman and his mother at the motel. Moorman told them that his mother felt better and had left earlier that evening with a friend, whom

---

1. Moorman was serving a term for kidnapping a nine-year-old girl.

Moorman did not know. He told the officers that he did not know where his mother was, and that he was growing concerned. Moorman invited the officers into the motel room, which had a medicinal smell. Thuesen and Hyland also spoke with the motel owner, who thought he had seen Mrs. Moorman around 6:00 p.m. Because this latter information was consistent with Moorman's statements, the officers did not then think anything was out of line with Moorman's story.

Thuesen and Hyland informed their superior, Captain Terry Horrall, that Mrs. Moorman was missing. They unsuccessfully searched for her. At about 1:00 a.m. on the 14th, Thuesen and Hyland returned to the motel and parked. Moorman came out of the room and told the officers that his mother had not returned and that he was worried about her because she had not taken her blood pressure medicine. Captain Horrall and another officer arrived and Moorman brought them into his room to show them his mother's medicine. The officers noticed small, brownish-red spots on the floor and wall; the floor appeared wet. During the conversation, Moorman told Horrall a different story from the one he had told Thuesen and Hyland earlier. He now said that his mother had asked him to purchase a knife as a gift for someone, and when he returned, she was gone. Horrall questioned Moorman about the "cow guts" and Moorman said that a cousin had given them to him and that he had flushed them down the toilet.

The police left Moorman's room around 1:20 a.m. Horrall told Thuesen and Hyland to keep the room under surveillance. About fifteen minutes later, Moorman left the room to use a pay telephone. At that time, according to police logs and testimony, Horrall instructed Thuesen and Hyland not to let Moorman back into the room. The police logs say that the instruction was to "secure" Moorman. There was some confusion at trial whether Horrall's command came seven minutes before or immediately after the police learned that a prison employee, at Moorman's request, had picked up a box of "dog bones" from Moorman shortly after midnight.

After receiving the instruction to secure Moorman, Thuesen asked Moorman if he wanted to sit in the police car with the officers and wait for his mother. Moorman got into the car. Shortly after 2:30 a.m., two prison authorities arrived and, out of Moorman's hearing, told Thuesen and Hyland that the box retrieved from the prison contained human body parts. Thuesen then told Moorman that he was under arrest for suspicion of murder.

At trial, Moorman admitted that he had killed his mother, but claimed that he was not guilty by reason of insanity. *See* A.R.S. § 13–502. A jury rejected Moorman's insanity defense and convicted him of first degree murder. A.R.S. § 13–1105. The trial court sentenced him to death. A.R.S. § 13–703. Moorman contends that his conviction should be overturned and that he should receive a new trial for seven reasons:

1. Post-arrest incriminating statements and a confession should have been suppressed because the police lacked probable cause to arrest.

2. Evidence seized from his motel room should have been suppressed because the search warrant did not list the items to be seized.

3. Evidence seized without a search warrant from Moorman's former living quarters at the prison should have been suppressed.

4. Statements and physical evidence taken at the police station should have been suppressed because Moorman was denied his right to counsel and because the statements were involuntary, unknowing, and unintelligent.

5. Irrelevant and unduly prejudicial photographs should not have been admitted.

6. A.R.S. § 13–502(B) (Supp.1986) is unconstitutional because it:

a. requires a defendant to prove insanity by "clear and convincing" evidence;

b. places the burden of proving insanity upon a defendant; and

c. usurps the rule-making powers granted exclusively to the Arizona Supreme Court.

7. The trial judge erred in complying with defendant's request that the jury not be instructed on lesser-included offenses.

In addition, Moorman claims that the trial court improperly sentenced him to death because it impermissibly found several aggravating factors and should have found other mitigating factors. We address each of these issues in turn.

## I. PROBABLE CAUSE TO ARREST

Moorman contends that he was arrested without probable cause at 1:35 a.m. on Saturday, January 14, when Officers Thuesen and Hyland asked him to sit with them in the police car. Moorman argues that the fruits of his illegal arrest—statements and other evidence used against him—should have been suppressed. *See Taylor v. Alabama*, 457 U.S. 687, 102 S.Ct. 2664, 73 L.Ed.2d 314 (1982); *Brown v. Illinois*, 422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975). The trial court admitted the evidence on the ground that, regardless whether Moorman was under arrest at 1:35 a.m., the police had probable cause to arrest him at that time. On appeal, the state contends that we need not reach the probable cause issue because there was no arrest until 2:37 a.m., when Thuesen and Hyland learned that the bones at the prison were human and formally placed Moorman under arrest.

■ Like the trial court, we find it unnecessary to decide whether Moorman was formally arrested at 1:35 a.m., because we believe the police had probable cause to make an arrest at that time. The police have probable cause to arrest when reasonably trustworthy information and circumstances would lead a person of reasonable caution to believe an offense has been committed by the suspect. *United States v. Watson*, 423 U.S. 411, 96 S.Ct. 820, 46 L.Ed.2d 598 (1976); *Brinegar v. United States*, 338 U.S. 160, 175–76, 69 S.Ct. 1302, 1310–11, 93 L.Ed. 1879 (1949); *State v. Nelson*, 129 Ariz. 582, 586, 633 P.2d 391, 395 (1981). Moorman contends that this test was not met. *See State v. Edwards*, 111 Ariz. 357, 529 P.2d 1174 (1974).

■ We agree with the trial court that the police had probable cause to arrest Moorman when Horrall instructed Thuesen and Hyland to secure him. At that time, the police knew the following information: Moorman was a convicted felon on weekend furlough. At 1:30 a.m., Moorman's 74–year–old mother could not be found in Florence, a relatively small town. Moorman had asked Johnson if he could dispose of some "cow guts" in the restaurant's dumpster. Moorman told Johnson that his mother was ill. Johnson, who knew Moorman, believed something was wrong. When the officers first checked with Moorman, his explanations were inconsistent with the story he had told Johnson. The police noticed small reddish-brown spots and the floor appeared wet in Moorman's hotel room. The police knew Moorman had purchased a knife. The room smelled medicinal. Moorman later told the police two different stories about his mother's absence. Neither story was persuasive. Moorman told Horrall an incredible and chilling story about flushing cow guts given to him by a relative down the toilet.

We think these pieces together add up to more than mere suspicion. The police did not need to find the remnants of the body before having probable cause to arrest. *Brinegar*, 338 U.S. at 175–76, 69 S.Ct. at 1310–11. Under these facts, the trial court was correct in finding that the police had probable cause to arrest.

## II. SEARCH WARRANT

Officer Horrall did not correctly complete the portion of the search warrant on which the items to be seized should have been listed. Consequently, the warrant itself contained no description of the items to be seized. Moorman contends, therefore, that the warrant was a general or exploratory warrant, condemned under the federal and state constitutions and state law. *E.g., Berger v. New York*, 388 U.S. 41, 58, 87 S.Ct. 1873, 1883, 18 L.Ed.2d 1040 (1967); *Stanford v. Texas*, 379 U.S. 476, 85 S.Ct.

506, 13 L.Ed.2d 431 (1965); A.R.S. § 13–3913 (search warrant must particularly describe the property to be seized and the place to be searched).

■ A defective description in the warrant may be saved by an adequate description in the affidavit. 1 W. LaFAVE & J. ISRAEL, CRIMINAL PROCEDURE § 3.4, at 229 (1984). In this case, the affidavit listed the items to be seized as "pillow case used to suffocate victim, knives, receipts, blood stains, victims [sic] identification and any other evidence." For an affidavit to save a defective warrant, it must appear at a minimum that the executing officer had the affidavit with him and referred to it; some courts also require that the affidavit be physically connected to the warrant and that the warrant expressly refer to the affidavit. *Id.; cf. State v. Woratzeck,* 130 Ariz. 499, 501–02, 637 P.2d 301, 303–04 (App.1981).

■ Captain Horrall filled out the affidavit for the search. The justice of the peace signed both the warrant and the affidavit. The warrant referred to the items to be seized as "such being more fully described in the affidavit." Horrall executed the warrant and was present during the search. He took both documents to the scene of the search, although he cannot remember whether they were physically attached. Morris Reyna, Jr., chief medical-legal investigator for the forensic science section of the University of Arizona, examined both documents before searching the room. Under these facts, where the warrant referred to the affidavit, the two documents were kept together during the search, and the investigating officer saw them both, we believe that the description in the affidavit saved the defective warrant from being an exploratory warrant. This type of technical mistake does not require suppression. *See Massachusetts v. Sheppard,* 468 U.S. 981, 104 S.Ct. 3424, 82 L.Ed.2d 737 (1984).

At trial, Moorman argued that the warrant was fatally overbroad on its face and, additionally, was executed as if it were a general or exploratory warrant. He has not clearly repeated these arguments on appeal. Nonetheless, we have considered them because of our duty to search the record for fundamental error.

■ The affidavit as incorporated in the warrant gave the police license to search for a pillow case, knives, receipts, blood stains ... *"and any other evidence"* (emphasis added). Vague, open-ended phrases such as this are constitutionally permissible only if restrictively interpreted to authorize a search for and seizure of evidence relating to the specific crime for which the individual is suspected. *See Andresen v. Maryland,* 427 U.S. 463, 479–83, 96 S.Ct. 2737, 2748–49, 49 L.Ed.2d 627 (1976). *But see State v. Robinson,* 139 Ariz. 240, 677 P.2d 1348 (App.1984). Therefore, the language of the affidavit/warrant itself did not render the warrant or the search defective.

In this case, however, the police apparently interpreted the phrase "and any other evidence" literally; they seized hundreds of items from room 22, including ballpoint pens, toothbrushes, toothpaste, a Diet Coke can, an unopened package of American cheese, and pencils. Reviewing the list of items seized from the motel room, it appears that the police took everything not physically attached to the room, whether described in the affidavit or not and whether relevant or not. Reyna, the person who led the search, testified that he wanted to dismantle the toilet bowl, but the Florence police would not let him because the department might be responsible for repair.

We believe the breadth of the search raises substantial questions. The trial court ruled that the search warrant was overbroad, and only allowed the state to bring in items specifically listed in the affidavit. *See Waller v. Georgia,* 467 U.S. 39, 43 n. 3, 104 S.Ct. 2210, 2214 n. 3, 81 L.Ed.2d 31 (1984) (only those items seized unlawfully pursuant to a valid search warrant should be suppressed); *Andresen,* 427 U.S. at 483–85, 96 S.Ct. at 2749–50.

■ The record is fuzzy, but it seems that the trial court also admitted several items not specifically listed in the affidavit (*e.g.,* articles of clothing, a plastic drinking

cup). None of these items was significant to the state's case and the defense did not specifically object to their admission. The court stated that it was willing to admit items not specifically described in the affidavit on the basis that the police had entertained a reasonable, good faith belief that their conduct was proper. *See* A.R.S. § 13–3925. Even assuming the validity and existence of a good-faith exception to an overbroad warrant, its application to a search as overbroad as this is debatable.[2] However, we need not reach this alternative basis for admission because the admission of these items, if erroneous, undoubtedly was harmless error given the tremendous volume of evidence available in this case and the defendant's admission that he killed his mother. *See State v. Mincey*, 130 Ariz. 389, 403, 636 P.2d 637, 651 (1981), *cert. denied*, 455 U.S. 1003, 102 S.Ct. 1638, 71 L.Ed.2d 871 (1982), *on later appeal*, 141 Ariz. 425, 687 P.2d 1180, *cert. denied*, 469 U.S. 1040, 105 S.Ct. 521, 83 L.Ed.2d 409 (1984).

### III. PRISON SEARCH

■ After Moorman's arrest, prison authorities performed a warrantless search of his living quarters at the Arizona State Prison. During the search, two of Moorman's lockers were unlocked. One of the documents discovered during the search was a forged codicil to Mrs. Moorman's will. The effect of the codicil was to leave her considerable estate to Moorman. The state used this document to show a motive for the murder. Moorman contends that the prison search violated his fourth amendment rights. However, the United States Supreme Court has held that "the Fourth Amendment proscription against

unreasonable searches does not apply within the confines of the prison cell" because prisoners have no reasonable expectation of privacy. *Hudson v. Palmer*, 468 U.S. 517, 526–31, 104 S.Ct. 3194, 3200–02, 82 L.Ed.2d 393 (1984). Therefore, neither prison authorities nor police needed a warrant to search Moorman's cell or, in this case, dormitory-like area.[3]

■ Defendant claims also that the evidence should have been suppressed because prison authorities violated the prison's regulations when they conducted the search. Even if true, suppression is not the remedy for a rules violation. *State v. Bishop*, 137 Ariz. 361, 363, 670 P.2d 1185, 1187 (App.1983).

### IV. STATEMENTS

After the police formally arrested and handcuffed Moorman, but before they had read Moorman his *Miranda* rights, Moorman said to Thuesen and Hyland, "I wonder if I need an attorney. I will leave it up to you guys if I need an attorney." Both officers heard this, but neither responded. They left Moorman in the car and were speaking with someone from the prison when Moorman called them over and stated that he wanted to make a full confession. At some point, Thuesen contacted Chief Rankin, told him Moorman was confessing, and asked the chief if he should read Moorman his *Miranda* rights. Rankin told Thuesen not to give the rights because Moorman was not being interrogated. The officers then told Moorman that they would hear his confession when they arrived at the police station. As they were driving him to the station, at 2:53 a.m., Moorman said, "You can change the charge. She's dead." The officers had not asked Moor-

---

2. The cases in which police permissibly broadened the scope of a warrant through the "plain view" doctrine are not inconsistent. *See Andresen, supra; Coolidge v. New Hampshire*, 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971); *State v. Scigliano*, 120 Ariz. 6, 583 P.2d 893 (1978). In those cases, the courts allowed the police to seize incriminating articles in plain view but not described in the search warrant. The courts did not hold, however, that the police could seize *everything* in view, whether relevant to any crime or not, as the police did here. *Accord* 1 W. LaFAVE & J. ISRAEL, *supra* § 3.4, at 236

(*Coolidge* has been interpreted to mean that the police must have probable cause to believe that the object seized is a fruit, instrumentality, or evidence of a crime.)

3. Moorman urged this court to recognize a "penumbral" first and ninth amendment right of privacy for the legal and personal documents and papers of prison inmates. *See* Appellant's Opening Brief at 9. We do not address this argument.

man any questions and had not read him *Miranda* rights.

At 3:12 a.m., at the police station, Moorman was "Mirandized." The police again read Moorman his rights before he gave a taped confession. At the end of the taped confession, Moorman identified the dumpsters in which the police would find other body parts. Then, at 4:44 a.m., Moorman requested an attorney. Police Chief Tom Rankin said efforts were made to get an attorney; meanwhile, Moorman was held at the police station. At 6:40 a.m., Reyna arrived to examine Moorman's clothes and take fingernail scrapings. Moorman still did not have an attorney. While Reyna was gathering evidence but not discussing the crime, Moorman pointed to spots on his pants and said they were his mother's blood. This statement was the only one suppressed by the trial court.

■ These facts raise several issues. First, did the police deny Moorman his right to an attorney when they ignored his initial inquiry about an attorney? When Moorman made this statement, he was under arrest but he was not being interrogated, one of the prerequisites for giving *Miranda* rights. *See* 1 W. LaFAVE & J. ISRAEL, *supra* § 6.2, at 448. Thus, the question arises whether Moorman even was entitled to an attorney at that time. We need not reach that issue, however, because even if the police had read Moorman his rights and were proceeding to interrogate him, his equivocal remarks were insufficient to invoke his right to counsel. *See State v. Linden*, 136 Ariz. 129, 664 P.2d 673 (App.1983) (citing cases).

■ Second, Moorman contends that the *Miranda* warnings he was given were inadequate because they did not inform him that he could have an attorney appointed for him before being questioned. Instead, according to Moorman, the warnings gave the impression that he could have an attorney appointed if he had any questions after the initial interrogation by the police. The record does not contain the substance of the first *Miranda* warnings. The sec-

ond set was transcribed from the taped confession:

> Officer Thuesen: You have the right to remain silent. Anything you say can and will be used against you in a court of law. *You have the right to talk to a lawyer and have him present with you while you are being questioned.* If you cannot afford to hire a lawyer, one will be appointed to represent you for any questions if you wish.

(emphasis added). Police are not required to use the precise language contained in the *Miranda* opinion. *See California v. Prysock*, 453 U.S. 355, 101 S.Ct. 2806, 69 L.Ed.2d 696 (1981). Nonetheless, the warning must inform the defendant that the right to counsel exists before and during interrogation; the warning must not convey the message that appointed counsel cannot be made available until some future time. 1 W. LaFAVE & J. ISRAEL, *supra* § 6.8, at 516–17. In our view the warning given adequately conveyed the message that Moorman had the right to an attorney before he answered any questions.

Third, Moorman contends that to elicit additional incriminating statements, the police detained him at the station after he had requested an attorney. *See, e.g., State v. Emery*, 131 Ariz. 493, 642 P.2d 838 (1982). The record shows that nothing Moorman said after 4:44 a.m. was admitted. The trial court suppressed the statement to Reyna. Of course, the trial court was not required to suppress physical evidence collected by Reyna because that evidence was nontestimonial. *See Schmerber v. California*, 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966).

■ Furthermore, we find nothing in the record that would suggest that Moorman's confession and other statements were involuntary, unknowing, or unintelligent.[4] The police twice read Moorman his rights; Moorman said he understood them and wanted to confess. There was no evidence of police misconduct or coercion. *See Arizona v. Mauro*, — U.S. —, 107

---

4. Defendant did not argue that his mental state or low intelligence made his statements involuntary, unknowing, or unintelligent, and we found no evidence of this in the record.

S.Ct. 1931, 95 L.Ed.2d 458 (1987); *Colorado v. Connelly*, — U.S. —, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986); *Rhode Island v. Innis*, 446 U.S. 291, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980). Accordingly, we hold that the trial court did not err in admitting the confession and other statements.

## V. PHOTOGRAPHS

Moorman contends that the trial court abused its discretion in admitting a photograph of the victim's head and a slide showing the left side of the victim's pelvis with green loops of decomposed bowel. *See* Rule 403, Ariz.R.Evid., 17A A.R.S.; *State v. Chapple*, 135 Ariz. 281, 288–90, 660 P.2d 1208, 1215–17 (1983). To determine whether the trial court abused its discretion, we first consider whether the exhibits were relevant to an issue in the case. *State v. Castaneda*, 150 Ariz. 382, 391, 724 P.2d 1, 10 (1986). Photographic evidence is relevant if it aids the jury in understanding the issue. *State v. Day*, 148 Ariz. 490, 497, 715 P.2d 743, 750 (1986). However, relevancy is not the sole test of admissibility. If the offered exhibit is of a nature to incite passion or inflame the jury, the court, keeping in mind the purpose of the offer, must go beyond relevancy and consider whether the probative value of the exhibit outweighs the danger of unfair prejudice created by admission of the exhibit. *Chapple, supra; Castaneda, supra.* We have identified various purposes for which photographs may be admitted: to prove corpus delicti, to identify the victim, to show the nature and location of the fatal injury, to determine the degree of the crime, to corroborate state witnesses, to illustrate or explain testimony, and to corroborate the state's theory of how and why the homicide was committed. *Castaneda, supra.* However, if the photographs have no tendency to prove or disprove a contested issue in the case, they have little use or purpose except to inflame and ordinarily are inadmissible. *Chapple, supra.*

In this case, the state agreed that it would not introduce the photograph of the victim's head if the defendant would stipulate to her identity. Because the defendant refused to so stipulate, the trial court allowed the state to admit one of four photos of the head. While we agree with the defendant that the state had other, less prejudicial ways to show the victim's identity, in our view the defendant brought the admission of this photograph upon himself.

According to the record, the state offered the slide showing the decomposed bowel (Exhibit 83) to show "the meticulousness of the dissection." While we can find purposes for most of the other nine slides, we do not understand the relevancy of this slide. The defendant admitted dismembering the body. The meticulousness of the dissection, in our view, is only marginally relevant to Moorman's state of mind when he suffocated the victim. Meticulous performance of senseless acts is as likely to be a symptom of insanity as of sanity. However, even if the admission of Exhibit 83 were error and an abuse of discretion, we are convinced that it was harmless. Given the volume of properly admitted evidence in this case, we are certain beyond a reasonable doubt that the jury would have convicted even if it had not seen Exhibit 83. *See Chapple*, 135 Ariz. at 297, 660 P.2d at 1224.

## VI. INSANITY STATUTE

Defendant claims that the insanity statute, A.R.S. § 13–502 (Supp.1986), is unconstitutional because it places the burden of proving insanity upon the defendant and because the defendant must prove insanity by clear and convincing evidence. The United States Supreme Court has long held that a state constitutionally may require a defendant to carry the burden of proving insanity beyond a reasonable doubt. *Leland v. Oregon*, 343 U.S. 790, 798, 72 S.Ct. 1002, 1007, 96 L.Ed. 1302 (1952). *See also Martin v. Ohio*, — U.S. —, 107 S.Ct. 1098, 94 L.Ed.2d 267 (1987).

We recently rejected a defendant's argument that the statute is unconstitutional because it violates the separation of powers doctrine. *See State v. Fletcher*, 149 Ariz. 187, 191–93, 717 P.2d 866, 870–72 (1986). We see no need to reconsider that analysis.

## VII. LESSER–INCLUDED OFFENSE INSTRUCTION

While the parties were discussing jury instructions, the trial judge said he was

inclined to give the jury an option of convicting Moorman of second degree murder or manslaughter instead of first degree murder. *See Beck v. Alabama,* 447 U.S. 625, 100 S.Ct. 2382, 65 L.Ed.2d 392 (1980); *Vickers v. Ricketts,* 798 F.2d 369 (9th Cir. 1986), *cert. denied sub nom. Ricketts v. Vickers,* — U.S. —, 107 S.Ct. 928, 93 L.Ed.2d 980 (1987). In response, Moorman's attorney said he and his client had discussed the matter and decided that they wanted the jury instructed only on first degree murder. Moorman was not present when this record was made. In his brief on appeal, Moorman claims that he does not recall any discussion of lesser-included offenses or any agreement with his lawyer on the issue. Moreover, Moorman contends that even if he objected to the giving of lesser-included instructions, the trial court had an obligation to give the instructions under *Beck v. Alabama.*

■ We need not review the record in depth to determine whether the evidence supported the lesser-included instructions. We see no reason why a murder defendant cannot knowingly waive his constitutional right to lesser-included instructions. Apparently, the decision not to request instructions on second degree murder or manslaughter was strategic. We have no evidentiary record on Moorman's claims that his attorney never discussed the matter with him. We therefore do not decide that issue.

### VIII. DEATH SENTENCE

The trial court found that the state had proved three aggravating factors beyond a reasonable doubt: Moorman previously had been convicted of an offense punishable by life imprisonment or death; the offense was committed for pecuniary gain; and the offense was committed in a heinous, cruel, or depraved manner. A.R.S. § 13–703. Moorman argues that the trial court erred in finding the third aggravating factor because there was insufficient evidence that the victim's bruises and puncture marks were inflicted before her death. In making this finding, the judge said:

I am referring to the treatment of the victim before the death by suffocation. I am not referring to the suffocation nor to the dismemberment of the body but rather I am referring to the tissue of the victim, the lacerations that were testified to by the medical examiner, and the bruising and marks that were testified to by the medical examiner.

We have reviewed the evidence and we find that it supports this finding. The medical examiner showed slides of predeath bruises on Mrs. Moorman's face, breasts, legs, and buttocks. He stated that the victim most likely was awake when some of the wounds were inflicted. In his confession to the police, Moorman said that he and the victim were arguing, and that he tied her up, hit her, and suffocated her. Accordingly, we find that the state proved this aggravating factor beyond a reasonable doubt.

■ We also agree with the trial court that the state proved the two other aggravating factors beyond a reasonable doubt. On balance, the one mitigating factor—Moorman's "significant impairment"—found by the trial court to be a mitigating circumstance, did not outweigh the aggravating circumstances.

With regard to proportionality, the facts speak for themselves. Matricide is above the norm of first degree murders, and Moorman's conduct places him above the norm of first degree murderers. *State v. Correll,* 148 Ariz. 468, 485, 715 P.2d 721, 738 (1986).

### CONCLUSION

We have searched the record for fundamental error. A.R.S. § 13–4037. Finding none, the judgment of conviction and the sentence of death are affirmed.

GORDON, C.J., and CAMERON and HOLOHAN, JJ., concur.

MOELLER, J., did not participate in the determination of this matter.