**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

ROBERT HENRY MOORMANN,
*Petitioner-Appellant,*

v.

CHARLES L. RYAN,*
*Respondent-Appellee.*

No. 08-99035

D.C. No.
2:91-CV-01121-
ROS

OPINION

Appeal from the United States District Court
for the District of Arizona
Roslyn O. Silver, District Judge, Presiding

Argued and Submitted
February 11, 2010—San Francisco, California

Filed December 8, 2010

Before: Mary M. Schroeder, M. Margaret McKeown and
Johnnie B. Rawlinson, Circuit Judges.

Opinion by Judge Schroeder

---

*Charles L. Ryan is substituted for his predecessor Dora B. Schriro as Director of the Arizona Department of Corrections. *See* Fed. R. App. P. 43(c)(2).

**COUNSEL**

Denise Irene Young, Tucson, Arizona, for petitioner/appellant Robert Henry Moormann.

Julie S. Hall, Oracle, Arizona, for petitioner/appellant Robert Henry Moormann.

John Pressley Todd, Phoenix, Arizona, for respondent/appellee Charles L. Ryan.

**OPINION**

SCHROEDER, Circuit Judge:

Robert Henry Moormann was convicted in Arizona and sentenced to death in 1985 for the brutal murder of his adoptive mother. The murder occurred in a Florence, Arizona motel room while Moormann was on furlough from the Ari-

zona State Prison. This case has a protracted history in both the Arizona state courts and in the federal courts. In 2005, we decided the first appeal from the district court's denial of habeas relief. *See Moormann v. Schriro (Moormann II)*, 426 F.3d 1044 (9th Cir. 2005). We affirmed the district court's dismissal of the vast majority of Moormann's claims, but remanded for consideration of whether the failure of Moormann's counsel to raise certain claims in Moormann's direct appeal to the Arizona Supreme Court constituted sufficient cause and prejudice to excuse Moormann's procedural default of those claims. *Id.* at 1060.

On remand, the district court again denied Moormann's habeas petition. The court then certified three issues for appeal, all relating to whether Moormann's counsel in his direct appeal to the Arizona Supreme Court rendered ineffective assistance by failing to raise claims alleging ineffective assistance of trial counsel in (1) failing to pursue alternative defenses, (2) waiving lesser-included-offense instructions, and (3) failing at sentencing to present lay witnesses concerning Moormann's background.

The procedural background and gruesome facts of this case are set forth in detail in our first opinion and in the Arizona Supreme Court's opinion on direct appeal. *See id.* at 1047-52; *State v. Moorman (Moormann I)*, 744 P.2d 679, 681-82 (Ariz. 1987).[1] We summarize only the essential facts relating to the crime, the relevant procedural history in the state courts, and the district court's disposition of the issues presented to it for consideration after our original remand.

In January 1984, Moormann was released on a 72-hour furlough from the Arizona State Prison in Florence, where he was serving a sentence of nine years to life for kidnapping. His adoptive mother, Roberta, traveled to Florence on Thurs-

---

[1]The state court misspelled Moormann's name in the caption. The correct spelling is "Moormann."

day, January 12, to visit him during this furlough. Moormann and Roberta checked into a room at the Blue Mist Motel that afternoon.

Sometime between 6:00 and 7:30 a.m. on Friday, January 13, Moormann went to a convenience store and purchased a steak knife and a buck knife. At about 9:00 a.m., Moormann went to the front desk of the motel and asked that maid service be held because his mother was ill. He also borrowed some disinfectant spray. At trial, the motel owner's wife testified that when she saw Moormann later that afternoon, he smelled horrible so she gave him some cleaning supplies for his room. Moormann later left some foul-smelling towels outside of his room door.

During the course of the day, Moormann went to multiple businesses in Florence and asked if he could dispose of some spoiled meat or animal guts in their dumpsters. After one of the business owners reported Moormann's suspicious conduct, two Florence police officers went to the Blue Mist Motel at about 10:30 p.m. to check on Roberta's welfare. Moormann told the officers that his mother had been feeling sick that morning but that she felt better later and had gone out visiting. The officers looked in the motel's dumpsters, did not see anything suspicious, and temporarily left the motel to continue their investigation.

At about 12:30 a.m. on Saturday, January 14, Moormann called a lieutenant at the prison and convinced him to dispose of a box, purportedly containing some dog bones and other garbage, that Moormann wanted to get rid of in the prison's dumpster. The police learned about the box about an hour later when they called the prison to inquire about Moormann and to report his suspicious behavior. The bones were examined and determined to be human. The police arrested Moormann, who quickly confessed to killing his mother and dismembering her body. The police obtained a warrant to search Moormann's motel room and discovered numerous

items stained with blood or human tissue. Police found the rest of Roberta's remains in trash dumpsters near the motel and in the sewer.

The forensic evidence presented at trial revealed that Roberta had been suffocated, probably after she had been beaten and stabbed. Moormann told police that he had tied Roberta up before he killed her, and the medical examiner found bruises in and around her mouth that were consistent with her having been gagged. The medical examiner testified at trial that the dismemberment of Roberta's body was very meticulous and probably took about two hours.

A search of Moormann's prison cell revealed a forged will, purporting to be Roberta's and bequeathing Moormann her estate in exchange for shares in his business, together with a forged letter explaining the reasons for the exchange. There was also evidence at trial that Roberta had planned to move away from Arizona when Moormann became eligible for parole in April 1984.

At trial, Moormann presented an insanity defense and declined the court's offer to instruct the jury on lesser-included offenses. The jury convicted him of first-degree murder after deliberating for two hours.

At sentencing, Moormann's counsel argued that Moormann's inability to fully understand his actions and his record of good behavior in prison weighed against imposing the death penalty. In support of this mitigation argument, counsel provided the trial judge with mental health records and letters from individuals who had known Moormann at various points in his life, and presented the testimony of two prison employees who had been acquainted with Moormann during his incarceration to testify about his good behavior in prison and his mental deficiencies. Moormann's counsel also asked the trial judge to consider all mitigating evidence presented at trial, including the evidence relating to Moormann's back-

ground and mental defects that was introduced as part of his insanity defense. The trial judge found as a mitigating factor that Moormann had an impaired capacity to appreciate the wrongfulness of his conduct or to conform his actions to the requirements of the law. *See* Ariz. Rev. Stat. § 13-703(G)(1) (West Supp. 1982-83). The court nevertheless sentenced Moormann to death on the basis of its finding there were three statutorily-enumerated aggravating factors: conviction of a previous offense for which a life sentence could be imposed, *see id.* § 13-703(F)(1); pecuniary motive, *see id.* § 13-703(F)(5); and the especially heinous, cruel, or depraved manner in which Moormann committed the murder, *see id.* § 13-703(F)(6).

Moormann appealed his conviction and sentence to the Arizona Supreme Court, and was appointed new counsel for the appeal. Appellate counsel raised a number of issues, but none relating to the ineffectiveness of trial counsel. The Arizona Supreme Court unanimously affirmed Moormann's conviction and sentence in October 1987. *See Moormann I*, 744 P.2d at 688.

In May 1988, Moormann filed his first petition for state post-conviction relief ("PCR") with the Arizona Superior Court. The court appointed the same lawyer who had handled Moormann's direct appeal to the Arizona Supreme Court to represent him in the initial PCR proceedings. Moormann's first PCR petition alleged that he received ineffective assistance of counsel at trial for various reasons. The Superior Court denied Moormann's ineffective assistance claims as procedurally barred under Arizona Rule of Criminal Procedure 32.2, because he did not raise them in the direct appeal of his conviction and sentence as required by then-existing Arizona law. *See, e.g., State v. Carriger*, 692 P.2d 991, 994-96 (Ariz. 1984); *cf. State v. Spreitz*, 39 P.3d 525, 526-27, ¶¶ 5-9 (Ariz. 2002).

Moormann filed a second PCR petition with the Arizona Superior Court in January 1991. The court then appointed

new counsel to represent Moormann, and Moormann's new counsel supplemented his pro se PCR petition with the ineffective assistance of counsel claims Moormann's prior counsel had raised in the first PCR petition. Moormann's new counsel also added a claim that Moormann's counsel in his direct appeal and first PCR proceeding had rendered ineffective assistance. The court denied Moormann's second PCR petition, ruling that all of the claims were either precluded or waived under state law, because they had either been previously presented to the state courts and rejected, or they had not been previously raised in Moormann's direct appeal or first PCR petition. Moormann sought review by the Arizona Supreme Court; the court denied his petition.

In 1991, Moormann filed his federal habeas corpus petition, which was stayed pending completion of the state PCR proceedings. The district court denied the petition in April 2000. On appeal, we affirmed the district court's denial of the majority of Moormann's claims, but vacated the district court's judgment and remanded for further proceedings to determine whether Moormann had shown sufficient cause and prejudice to excuse the procedural default of any claims asserted in his federal habeas petition that had been raised in his first or second state PCR petitions, but had not been raised by Moormann's counsel in his direct appeal to the Arizona Supreme Court. *Moormann II*, 426 F.3d at 1060. We held that the failure of Moormann's appellate counsel to raise these claims on direct appeal would constitute ineffective assistance excusing the default if appellate counsel's failure to assert the claims on direct appeal actually prejudiced Moormann. *Id.*

On remand, Moormann contended that his counsel in his direct appeal rendered ineffective assistance by failing to raise essentially four claims, three of which related to the effectiveness of trial counsel's performance. Moormann argued that appellate counsel's ineffective representation in not raising these claims excused their procedural default. The district court again denied Moormann's habeas petition, holding he

had not overcome the procedural bar to his remaining claims because appellate counsel's representation of Moormann during his direct appeal was not constitutionally deficient. Moormann moved for reconsideration, arguing the court erred in failing to hold an evidentiary hearing on his claims. The court denied this motion.

The district court certified three issues for this appeal. Moormann asks us, additionally, to consider a contention that was not certified, relating to trial counsel's failure to present expert witnesses at the sentencing hearing to testify concerning Moormann's childhood. Because this claim was never raised in either of the state PCR petitions, our prior decision requires us to conclude that it is procedurally barred. *See Moormann II*, 426 F.3d at 1059 (limiting remand to "those claims that were presented in [Moormann's] first and second PCR" petitions). We deal with each of the certified claims, and now conclude that none can form the basis for habeas relief.

## I.   Applicable Standards for Habeas Review in this Case

[1] All of the issues before us relate to claims of ineffective assistance of appellate counsel in state court. "The due process clause of the fourteenth amendment guarantees a criminal defendant the right to the effective assistance of counsel on his first appeal as of right." *Miller v. Keeney*, 882 F.2d 1428, 1431 (9th Cir. 1989) (citing *Evitts v. Lucey*, 469 U.S. 387 (1985)). We review claims of ineffective assistance of appellate counsel under the familiar standard set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). *See Smith v. Robbins*, 528 U.S. 259, 285 (2000); *Pizzuto v. Arave*, 280 F.3d 949, 969 (9th Cir. 2002). First, the petitioner must show that counsel's performance was objectively unreasonable, which in the appellate context requires the petitioner to demonstrate that counsel acted unreasonably in failing to discover and brief a merit-worthy issue. *Smith*, 528 U.S. at 285; *Wildman v. Johnson*, 261 F.3d 832, 841-42 (9th Cir. 2001). Sec-

ond, the petitioner must show prejudice, which in this context means that the petitioner must demonstrate a reasonable probability that, but for appellate counsel's failure to raise the issue, the petitioner would have prevailed in his appeal. *Smith*, 528 U.S. at 285-86.

**[2]** The analysis in this case, however, is somewhat complicated by the fact that each of Moormann's claims of ineffective assistance of appellate counsel relates to appellate counsel's failure to raise issues regarding the effectiveness of trial counsel's representation. Thus, to determine whether appellate counsel's failure to raise these claims was objectively unreasonable and prejudicial, we must first assess the merits of the underlying claims that trial counsel provided constitutionally deficient representation. *See Hain v. Gibson*, 287 F.3d 1224, 1231 (10th Cir. 2002) (to properly address a claim of ineffective assistance of appellate counsel, court must look to the merits of the omitted issue). If trial counsel's performance was not objectively unreasonable or did not prejudice Moormann, then appellate counsel did not act unreasonably in failing to raise a meritless claim of ineffective assistance of counsel, and Moormann was not prejudiced by appellate counsel's omission. *See Wildman*, 261 F.3d at 840 ("[A]ppellate counsel's failure to raise issues on direct appeal does not constitute ineffective assistance when appeal would not have provided grounds for reversal."); *Pollard v. White*, 119 F.3d 1430, 1435 (9th Cir. 1997) ("A hallmark of effective appellate counsel is the ability to weed out claims that have no likelihood of success, instead of throwing in a kitchen sink full of arguments with the hope that some argument will persuade the court.").

We review the district court's denial of Moormann's habeas petition de novo. *See McMurtrey v. Ryan*, 539 F.3d 1112, 1118 (9th Cir. 2008). The deference required by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C. § 2254, does not apply because Moormann filed his habeas petition before AEDPA became effec-

tive. *See Lindh v. Murphy*, 521 U.S. 320, 336 (1997); *Moormann II*, 426 F.3d at 1047-48.

## II.   Alternative Defenses — The *Christensen* Argument

Moormann argues his appellate counsel rendered ineffective assistance when he failed to assert on direct appeal the ineffectiveness of trial counsel in relying exclusively on the insanity defense rather than investigating and pursuing alternative defenses to the first-degree murder charge. He specifically contends his trial counsel should have presented a defense under *State v. Christensen*, 628 P.2d 580 (Ariz. 1981), on the basis of Moormann's purported character trait of acting impulsively and reflexively in response to stressful circumstances. He argues that the assertion of this defense would have prevented the jury from convicting him of first-degree murder.

**[3]** In *Christensen*, the Arizona Supreme Court held that a defendant charged with committing premeditated murder may put on evidence tending to show that the defendant has a character trait of acting without reflection. *Id.* at 583. The defendant may then use this character evidence to establish that he acted impulsively and did not premeditate the homicide he is accused of committing. *Id.* The defendant in *Christensen* had been charged with the premeditated murder of his ex-wife. *Id.* at 582. Having admitted to the homicide, the defendant attempted to introduce at trial expert testimony from a psychiatrist establishing that he had difficulty dealing with stress, and that in stressful circumstances his actions were more reflexive than reflective. *Id.* The Arizona Supreme Court reversed the trial court's exclusion of this expert testimony, holding the evidence was admissible under Arizona's counterpart to Federal Rule of Evidence 404(a)(1) (permitting an accused to offer evidence of a pertinent trait of his own character). *Id.* at 582-83. The court, however, went on to limit its holding by stating that although a defendant may use expert testimony to establish that he possesses a character trait of

acting impulsively, the expert "may not testify specifically as to whether a defendant was or was not acting reflectively at the time of a killing." *Id.* at 583-84.

Moormann contends that had trial counsel conducted a thorough investigation into Moormann's background, counsel would have discovered evidence that competent experts could have used to validate Moormann's claim that Roberta sexually abused him up to and through the day of her death. Those experts could then opine that Roberta's abuse exacerbated Moormann's multiple disabilities and caused him to panic, lose control, and kill Roberta without the reflection necessary for a premeditated murder. In support of this argument, Moormann relies on declarations from licensed mental health professionals discussing the likelihood that Moormann and Roberta had an incestuous relationship and diagnosing the mental deficiencies he would have suffered as a result of this relationship and other aspects of his background.

We need not address the reasonableness of trial counsel's decision to rely exclusively on a defense of insanity, however, because trial counsel's failure to investigate and pursue a *Christensen* defense did not prejudice Moormann. *See Strickland*, 466 U.S. at 697 ("If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed."). Even if trial counsel had conducted a more thorough investigation into Moormann's background, uncovered the information produced during these habeas proceedings, and supplied it to competent experts to testify about Moormann's purported trait of acting impulsively and reflexively in response to stressful situations, there is no reasonable probability the presentation of this expert testimony at Moormann's trial would have resulted in the jury acquitting him of the first-degree murder charge. As the district court correctly pointed out, no expert would have been allowed to testify that Moormann acted impulsively at the time of the murder. *See Christensen*, 628 P.2d at 583-84. Instead, the experts' testi-

mony "would have been limited to a general description of [Moormann's] behavioral tendencies." *Summerlin v. Stewart*, 341 F.3d 1082, 1095 (9th Cir. 2003) (en banc), *rev'd on other grounds sub nom. Schriro v. Summerlin*, 542 U.S. 348 (2004). This testimony would have had limited probative value given the evidence that Moormann planned the killing.

Under Arizona law at the time of Roberta's murder, "premeditation" required that the defendant act "with either the intention or the knowledge that he will kill another human being, when such intention or knowledge precedes the killing by a length of time to permit reflection." Ariz. Rev. Stat. § 13-1101(1) (West 1978). An act was not done with premeditation if it was "the instant effect of a sudden quarrel or heat of passion." *Id.* Premeditation could, however, be "as instantaneous as successive thoughts of the mind." *State v. Kreps*, 706 P.2d 1213, 1216 (Ariz. 1985).

Overwhelming evidence supported the prosecution's theory that Moormann premeditated Roberta's murder. Moormann told police shortly after his arrest that he tied Roberta up with torn pieces of a towel before he killed her. Although the medical examiner could not verify that Roberta's hands and ankles had been tied, because Moormann severed them from her body postmortem, the medical examiner did discover several small bruises on Roberta's face and additional bruising and fibers inside her mouth that were consistent with her having been gagged prior to her death. Police also found pieces of torn towel in the dumpsters where they discovered parts of Roberta's dismembered body, thus tending to corroborate Moormann's admission that he had tied her up before he killed her. The evidence that Moormann bound and gagged Roberta indicated he had sufficient time to reflect before he killed her, and that the slaying was not the result of a sudden quarrel or heat of passion.

The prosecution also presented evidence that Roberta had been hit with a "moderate degree of force" on multiple parts

of her body, and that she had been stabbed five or six times with the tip of a knife before she died. The evidence indicated that Moormann went to the convenience store and purchased the knives before he killed Roberta, and that he beat and stabbed her before he suffocated her. Moormann partially corroborated this theory of events when he told police that he hit Roberta a few times before tying her up and then suffocating her. All of these actions demonstrate that Moormann had ample time to reflect before killing Roberta, and they undercut his claims that he either killed her in a moment of rage or, alternatively, he accidentally suffocated her while the two were having sex.

The prosecution's theory of premeditation was further supported by the evidence of motive. The documents found in Moormann's prison cell relating to Roberta's will indicate he may have been attempting to obtain her assets before her planned move away from Arizona. One of Roberta's friends testified at trial that Moormann called her on the morning of the murder and asked her to give him a ride to Mesa, Arizona, so that he could see a lawyer. The jury could have inferred this related to the forged will and his plan to obtain control of Roberta's estate. Indeed, the trial court concluded at sentencing that this evidence demonstrated that Moormann committed the murder with an expectation of pecuniary gain.

[4] In contrast to the overwhelming evidence of premeditation, there was little evidence to support a theory that Moormann killed Roberta on an act of impulse, even if trial counsel had successfully introduced expert testimony establishing that Moormann acted impulsively and reflexively in response to stressful circumstances. Moormann told the police after his arrest that his mother had made him take his father's place and do things he could not handle, which caused him to lose control and kill Roberta, but he also admitted during the taped portion of his confession that he tied his mother up after they argued and before he suffocated her, indicating he had time to reflect. While Moormann later told a forensic psychiatrist

that he had an incestuous relationship with Roberta and that he had accidentally suffocated her with a pillow while they were having sex, the medical examiner testified that he found no evidence of sexual activity and tests run on the sheets and bedspread from the motel room found no evidence of semen.

**[5]** Trial counsel did not therefore render ineffective assistance by failing to investigate and pursue a *Christensen* defense, because there is no reasonable probability that the presentation of such a defense would have produced a different verdict at Moormann's trial. *See Strickland*, 466 U.S. at 694. For this reason, the failure of Moormann's appellate counsel to argue trial counsel's ineffectiveness in not presenting a *Christensen* defense as a basis for reversal of Moormann's conviction was neither deficient representation nor prejudicial. Counsel was not required to raise a meritless issue on direct appeal, and there is no reasonable probability that had counsel raised this claim, the Arizona Supreme Court would have reversed Moormann's conviction. *See Jones v. Smith*, 231 F.3d 1227, 1239 n.8 (9th Cir. 2000) (no prejudice when appellate counsel fails to raise an issue on direct appeal that is not grounds for reversal); *Miller*, 882 F.2d at 1434 (appellate counsel remains above objective standard of competence and does not cause client prejudice when counsel declines to raise a weak issue on appeal); *Boag v. Raines*, 769 F.2d 1341, 1344 (9th Cir. 1985) ("Failure to raise a meritless argument does not constitute ineffective assistance.").

## III.   Waiver of Lesser-Included-Offense Instructions

The jury was instructed on first-degree murder and on Moormann's insanity defense. The trial court did not instruct the jury on the lesser-included offenses of second-degree murder and manslaughter because Moormann's trial counsel, after consultation with Moormann, reported they had agreed not to request such instructions; the State opposed giving them. In Moormann's direct appeal to the Arizona Supreme Court, his appellate counsel argued the lesser-included-offense instruc-

tions should have been given by the court *sua sponte*. Appellate counsel did not argue, however, that trial counsel provided ineffective assistance by waiving the lesser-included-offense instructions.

On habeas, Moormann contends his trial and appellate counsel were ineffective and seeks habeas relief on the ground that his appellate counsel should have asserted in the direct appeal to the Arizona Supreme Court that trial counsel provided ineffective assistance by waiving the lesser-included-offense instructions. Moormann argues the evidence presented at trial warranted these instructions and reasonably competent trial counsel would have requested them. He asserts he was prejudiced because had the jury been instructed on these lesser-included offenses, it would have acquitted him of the first-degree murder charge.

The trial record reflects that Moormann's trial counsel consulted with him and then declined the trial court's offer to instruct the jury on the lesser-includeds. At the close of evidence, the trial judge and the attorneys retired to chambers to work on the jury instructions. Although the discussions that ensued took place off the record, the court the next day, after counsel had made their closing arguments and the jury had retired to deliberate, made the following record concerning those discussions:

> THE COURT: Now, I guess there is some record that should be made insofar as the forms of verdicts are concerned and then later you may want to make a record on the instructions.
>
> . . . .
>
> The record may . . . show at the time of settling instructions and discussing verdicts, the question arose as to whether the jury would be instructed on the second degree murder and on manslaughter.

Counsel and the Court discussed that matter. The Court stated that it was inclined to give the instruction on those two if requested to do so by Defense Counsel. State opposed the giving of any form of verdict other than the first—on first degree murder, and cited State versus Vickers as authority along with the case is [sic] cited in the Vickers case.

I requested Mr. Kelly [Moormann's trial counsel] to consider whether or not he wished to request those instructions and forms of verdict on the lesser offenses. He stated that he wished to do so and that he also wished to discuss it with his client.

This morning before we started court, Mr. Kelly informed me that he did not wish to have forms of verdicts as to second degree murder and as to manslaughter. Nor did he wish to have the jury instructed on those. I stated a further record could be made by the attorneys on that matter at the first convenient time with the same effect as if made before we started argument.

Now you can make any further record.

MR. KELLY: Not on that matter, Your Honor.

I did — I did discuss with my client the various options concerning charging the jury and the forms of verdict, and it was agreed after speaking with him the course of action that we took.

The jury was therefore instructed solely on first-degree murder and the insanity defense.

Although Moormann's counsel in the direct appeal of his conviction argued the trial court erred in not *sua sponte* instructing the jury on the lesser-included offenses of second-

degree murder and manslaughter, the Arizona Supreme Court rejected this argument. *Moormann I*, 744 P.2d at 688. It concluded Moormann had waived his constitutional right to the lesser-included-offense instructions, and that the decision not to request those instructions was strategic. *Id.* The court stated:

> While the parties were discussing jury instructions, the trial judge said he was inclined to give the jury an option of convicting Moorman of second degree murder or manslaughter instead of first degree murder. In response, Moorman's attorney said he and his client had discussed the matter and decided that they wanted the jury instructed only on first degree murder. Moorman was not present when this record was made. In his brief on appeal, Moorman claims that he does not recall any discussion of lesser-included offenses or any agreement with his lawyer on the issue. Moreover, Moormann contends that even if he objected to the giving of lesser-included instructions, the trial court had an obligation to give the instructions under *Beck v. Alabama*.
>
> We need not review the record in depth to determine whether the evidence supported the lesser-included instructions. We see no reason why a murder defendant cannot knowingly waive his constitutional right to lesser-included instructions. Apparently, the decision not to request instructions on second degree murder or manslaughter was strategic. We have no evidentiary record on Moormann's claims that his attorney never discussed the matter with him. We therefore do not decide that issue.

*Id.* at 687-88 (citations omitted).

In these habeas proceedings, Moormann has submitted a declaration by his trial counsel to support his threshold con-

tention that trial counsel did not act in a reasonably competent fashion when he declined the court's offer to instruct the jury on the lesser-includeds. In his declaration, trial counsel stated there was no strategic decision to forgo the instructions and that Moormann did not understand the proceedings:

> I do not remember the details regarding the discussions Robert and I had on the lesser included offense instructions. But I do know that I did not make a strategic decision to not request those instructions. I tried talking to Robert about the instructions, but Robert did not understand legal decisions or the consequences of those decisions. When I discussed legal issues with Robert, I was not sure he understood what we were talking about, or even the meaning of the words I used. But the judge had earlier found Robert competent to stand trial, and as a result, I did not think there was anything I could do about Robert's inability to understand much of what was going on. I believed Robert suffered delusions and as a result, did not always understand the content of what he was saying, or what I was saying.

Moormann asserts this declaration demonstrates that trial counsel unreasonably relied on Moormann's preferences concerning the giving of lesser-included-offense instructions, even though he knew Moormann was mentally unfit to make legal decisions about his defense.

[6] We do not decide whether trial counsel's waiver of the lesser-included-offense instructions in these circumstances fell below prevailing standards of professional competence, because Moormann did not suffer any prejudice from appellate counsel's failure to raise the ineffectiveness claim in Moormann's direct appeal. *See Smith*, 528 U.S. at 286 n. 14 ("The performance component [of an ineffective assistance of appellate counsel claim] need not be addressed first."). The ineffectiveness claim would have been similar or in addition

to the claim appellate counsel did make, which was that the trial court erred in not *sua sponte* instructing the jury on the lesser-includeds. The Arizona Supreme Court concluded that Moormann made a strategic waiver of his right to have the jury instructed on the lesser-includeds, and there was no reason for the trial court to countermand that decision with a *sua sponte* instruction. *Moormann I*, 744 P.2d at 688. The finding of a strategic decision, supported by the trial record, would in all likelihood have foreclosed any holding of ineffective assistance of trial counsel as well.

**[7]** Trial counsel's declaration does not change this result. Although counsel made the bare assertion that the decision to waive lesser-included-offense instructions was not strategic, he admitted that he did not remember the details of the discussions he had with Moormann on the subject. There is nothing in trial counsel's declaration to contradict the Arizona Supreme Court's finding that Moormann knowingly waived the lesser-included-offense instructions. Moormann's appellate counsel therefore did not provide ineffective assistance by failing to raise this issue in Moormann's direct appeal.

## IV. Failure to Call Lay Witnesses at Sentencing Regarding Moormann's Childhood

Moormann argues his appellate counsel provided ineffective assistance by not asserting a claim on direct appeal that trial counsel's failure to call any lay witnesses at the penalty phase to testify about Moormann's troubled childhood and adolescence constituted ineffective assistance. Moormann contends that reasonably competent trial counsel would have conducted a more thorough investigation into Moormann's past by interviewing family members, neighbors, fellow students, former doctors, teachers, and foster families, and gathering social, family, and criminal justice records. From such an investigation, Moormann asserts, trial counsel would have gleaned critical mitigation evidence about Moormann's background that could have been presented to the trial judge at

sentencing through the testimony of lay witnesses. Moormann contends this evidence would have spared him from a capital sentence.

In support of this claim, Moormann proffered in these habeas proceedings numerous records and documents concerning his biological mother, his foster care and adoption, and his education that were not presented to the trial court at sentencing. Moormann also proffered declarations from one of his foster parents, a former classmate, two educators from his elementary school, and multiple medical professionals who treated him as a child or adolescent. These declarations indicate Moormann had a troubled childhood; that he suffered from behavioral, mental, social, and emotional problems; and that others in the community generally considered him to be "strange" or "abnormal." Two of the declarations briefly discuss Moormann's relationship with Roberta, but neither provides firsthand information about sexual abuse.

**[8]** The Supreme Court held in *Strickland* that "counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." 466 U.S. at 691. Even if trial counsel for a capital defendant conducts an investigation into mitigating evidence that is unreasonable under prevailing professional norms, however, counsel's failures to uncover and present additional mitigation evidence at the penalty phase must still prejudice the defendant before counsel's inadequate performance will be found to constitute a Sixth Amendment violation. *See Wiggins v. Smith*, 539 U.S. 510, 534 (2003). To assess prejudice, "we reweigh the evidence in aggravation against the totality of available mitigating evidence." *Id.*; *see also Stankewitz v. Woodford*, 365 F.3d 706, 716 (9th Cir. 2004) ("[A] penalty phase ineffective assistance claim depends on the magnitude of the discrepancy between what counsel did investigate and present and what counsel could have investigated and presented.").

**[9]** The problem here is that essentially all of the material information from the potential lay witnesses identified by Moormann during these habeas proceedings was actually before the sentencing court during the penalty phase of Moormann's trial. Extensive evidence of Moormann's history of behavioral, mental, social, and emotional difficulties was presented at trial, and trial counsel requested the court consider this evidence in mitigation of Moormann's crime during the penalty phase. The evidence included the testimony of Dr. Daniel Overbeck, Moormann's psychological expert, who reviewed Moormann's medical, psychological, school, jail, parole, prison, and police records, and testified about Moormann's mental health background from the age of two through the time of trial. Trial counsel also submitted a packet of sentencing materials to the court that included a letter from a family physician who had known Moormann since he was twelve years old, and a letter from Moormann's fourth grade teacher. The letter from the teacher provided a summary of Moormann's difficulties as a child and student, and attached a report from a doctor who had evaluated Moormann when he was in the fifth or sixth grade. We therefore agree with the district court that even if trial counsel acted unreasonably by not conducting a more thorough investigation into Moormann's childhood background, the failure to present lay witness testimony on the subject at sentencing did not prejudice Moormann.

Despite the cumulative nature of the new evidence as it relates to Moormann's mental state, Moormann contends its absence nevertheless prejudiced him because it would have tended to make his allegations that Roberta sexually abused him more believable. The record, however, does not bear out this assertion. None of the declarations from the potential new lay witnesses proffered by Moormann in these habeas proceedings provides any corroboration of Moormann's allegations that Roberta sexually abused him as a child. At most, the declarations describe an overly protective mother who had an odd relationship with her son. Moormann does not point to a

single potential lay witness who knew him as an adolescent or child that could testify to facts supporting his allegations of sexual abuse.

[10] The new documents Moormann proffered to the district court in these habeas proceedings did provide a more detailed account of his background, particularly with respect to his biological mother. This evidence, however, was cumulative of the evidence already before the trial court at sentencing. Moreover, the evidence was most relevant to show as a mitigating factor that Moormann's capacity to appreciate the wrongfulness of his conduct or to conform his actions to the law was significantly impaired. *See* Ariz. Rev. Stat. § 13-703(G)(1) (West Supp. 1982-83); *State v. Mauro*, 766 P.2d 59, 81 (Ariz. 1988) (reducing capital sentence to life sentence because significant impairment of defendant's capacity to control his conduct was a "sufficiently substantial" mitigating circumstance to outweigh the two aggravating factors found by the trial court). Yet the trial court found this mitigating factor to have been proven beyond a reasonable doubt on the basis of the evidence it already had before it. The new material would not have affected the result because the court found the three aggravating factors—conviction of a previous offense for which a life sentence could be imposed; pecuniary motive; and the especially cruel, heinous, or depraved manner in which the crime was committed—outweighed the single mitigating factor. Thus, there is no reasonable probability that the cumulative evidence identified in these habeas proceedings would have affected the sentence imposed by the trial judge. Moormann therefore suffered no prejudice at the penalty phase of his trial. *See Wong v. Belmontes*, 130 S. Ct. 383, 388 (2009).

[11] Even assuming there was a plausible argument that trial counsel should have done more, there was no reasonable probability that the Arizona Supreme Court would have reversed Moormann's capital sentence, even if appellate counsel had raised the issue on direct appeal. The Arizona

Supreme Court agreed with the trial court that the State proved beyond a reasonable doubt the three aggravating factors, and held that these aggravating factors outweighed the single mitigating circumstance established by Moormann. *Moormann I*, 744 P.2d at 688. Since the potential lay witnesses identified by Moormann in these habeas proceedings could only offer mitigating evidence cumulative of the one mitigating factor the trial judge had already found, and the remaining information was cumulative of information already before the sentencing court, there is no reasonable probability the Arizona Supreme Court would have concluded trial counsel rendered ineffective assistance at the penalty phase by not presenting such evidence. Appellate counsel's failure to raise this claim on direct appeal did not prejudice Moormann, and there was no Fourteenth Amendment due process violation. *See Smith*, 528 U.S. at 285-86.

## CONCLUSION

We conclude that Moormann has not established that his appellate counsel rendered constitutionally deficient representation by failing to raise claims of ineffective assistance of trial counsel in Moormann's direct appeal to the Arizona Supreme Court. The district court therefore properly held that Moormann has not shown the cause and prejudice necessary to excuse the procedural default of his ineffective assistance of trial counsel claims. *See Moormann II*, 426 F.3d at 1060. Accordingly, we affirm the district court's denial of Moormann's petition for a writ of habeas corpus. Moormann was not entitled to an evidentiary hearing on these claims because even if the new evidence proffered in these federal habeas proceedings is assumed to be true, he would not be entitled to the relief he seeks. *See Turner v. Calderon*, 281 F.3d 851, 890 (9th Cir. 2002).

**AFFIRMED**.